No. 2023-2413

---

IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION,

*Plaintiffs-Appellants*,

DATONG JUQIANG ACTIVATED CARBON CO., LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD.,

*Plaintiffs*

v.

UNITED STATES, CALGON CARBON CORPORATION, NORIT AMERICAS, INC.,

*Defendants-Appellees*.

---

Appeal from the United States Court of International Trade in Consol. Court No. 22-cv-00017, Chief Judge Mark A. Barnett

---

## **BRIEF OF DEFENDANT-APPELLEE UNITED STATES**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

                                                CLAUDIA BURKE
                                                Deputy Director
OF COUNSEL:


ASHLANDE GELIN                                  ANTONIA R. SOARES
Attorney                                        Senior Trial Counsel
Office of the Chief Counsel                     U.S. Department of Justice
     for Trade Enforcement &                    Civil Division
     Compliance                                 Commercial Litigation Branch
  U.S. Department of Commerce                   P.O. Box 480, Ben Franklin Station
                                                Washington D.C. 20044
                                                antonia.soares@usdoj.gov


March 18, 2024                                  Attorneys for Defendant-Appellee

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE CASE..................................................................2

STATEMENT OF FACTS .......................................................................3

I.     Legal Framework For Surrogate-Country And Surrogate-Value
       Selection....................................................................................3

II.    Administrative Background.........................................................8

       A.     Initiation Of The Thirteenth Administrative Review And
              Surrogate Value Selection ..................................................8

       B.     Preliminary Results ............................................................9

       C.     Final Results.....................................................................10

III.   Trial Court Proceeding .............................................................11

SUMMARY OF THE ARGUMENT .....................................................11

ARGUMENT .........................................................................................13

I.     Standard Of Review..................................................................13

II.    Commerce's Determination That Malaysia Was The Only "Significant
       Producer" Of Activated Carbon Was Supported By Substantial Evidence
       And Otherwise Lawful ..............................................................15

       A.     The Trial Court Did Not Err In Sustaining Commerce's
              Determination...................................................................15

       B.     CAT Fails To Identify Trial Court Error.............................16

i

III.   Substantial Evidence Supports Commerce's Selection Of The Surrogate
       Values ................................................................................................27

       A.    Substantial Evidence Supports Commerce's Selection Of Surrogate
             Financial Ratios.................................................................................28

             1.    The Trial Court Did Not Err In Sustaining Commerce's
                   Determination...........................................................................28

             2.    CAT Fails To Identify Trial Court Error ...................................30

       B.    Substantial Evidence Supports Commerce's Selection Of The
             Surrogate Value For Carbonized Material ...........................................38

             1.    The Trial Court Did Not Err In Sustaining Commerce's
                   Determination...........................................................................39

             2.    CAT Fails To Identify Trial Court Error ...................................39

       C.    Substantial Evidence Supports Commerce's Selection Of The
             Surrogate Value For Coal Tar ..............................................................48

             1.    The Trial Court Did Not Err In Sustaining Commerce's
                   Selection Of Malaysian HTS 2706.00 To Value Coal Tar.......48

             2.    Commerce Lawfully Rejected Malaysian Domestic Prices To
                   Value Coal Tar ..........................................................................51

             3.    Commerce Lawfully Rejected Russian HTS 2706.00 To Value
                   Coal Tar.....................................................................................53

       D.    Substantial Evidence Supports Commerce's Selection Of The
             Surrogate Value For Hydrochloric Acid  .............................................53

       E.    Substantial Evidence Supports Commerce's Selection Of The
             Surrogate Value For Steam ..................................................................56

       F.    Substantial Evidence Supports Commerce's Selection Of The
             Surrogate Value For Ocean Freight .....................................................62

CONCLUSION ...........................................................................................64

# TABLE OF AUTHORITIES

## Cases

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  618 F.3d 1316 (Fed. Cir. 2010) ..................................................... 38, 39

*Ancientree Cabinet Co. v. United States*,
  532 F. Supp. 3d 1241 (Ct. Int'l Trade 2021) ................................. 13, 48

*Calgon Carbon Corp.* v. *United States*,
  No. 14-00326, 2017 WL 384685 (Ct. Int'l Trade Jan. 27, 2017) ................ 47, 48

*Carbon Activated Tianjin Co. v. United States*,
  503 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) ................................. 26, 27

*Carbon Activated Tianjin Co. v. United States*,
  586 F. Supp. 3d 1360 (Ct. Int'l Trade 2022) ................................. *passim*

*Carbon Activated Tianjin Co. v. United States*,
  633 F. Supp. 3d 1329 (Ct. Int'l Trade 2023) .................................... 41

*Carbon Activated Tianjin Co. v. United States*,
  547 F. Supp. 3d 1310 (Ct. Int'l Trade 2021) ................................. 21, 22

*Carbon Activated Tianjin Co. v. United States*,
  650 F. Supp. 3d 1354 (Ct. Int'l Trade 2023) ................................. *passim*

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
  975 F.3d 1318 (Fed. Cir. 2020) .................................................... 44

*Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfr. v.
  United States*, 44 F. Supp. 2d 229 (Ct. Int'l Trade 1999) ............................ 14, 15

*CP Kelco US, Inc. v. United States*,
  949 F.3d 1348 (Fed. Cir. 2020) .................................................... 38

*Dorbest Ltd. v. United States*,
  462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) ........................................ 7

*Dorbest Ltd. v. United States*,
  604 F.3d 1363 (Fed. Cir. 2010) .................................................... 28

*Downhole Pipe & Equip., L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) .................................................... *passim*

*Dupont Teijin Films USA, LP v. United States*,
407 F.3d 1211 (Fed. Cir. 2005) .............................................................13

*Fine Furniture (Shanghai) Ltd. v. United States*,
353 F. Supp. 3d 1323 (Ct. Int'l Trade 2018).......................................58

*Fresh Garlic Producers Ass'n v United States*,
121 F. Supp. 3d 1313 (Ct. Int'l Trade 2015).........................................6

*Hebei Metals Inc. v. United States*,
29 C.I.T. 288 (2005) ................................................................ 53, 54, 55

*Home Meridian Int'l. Inc. v. United States*,
772 F.3d 1289 (Fed. Cir. 2014) ............................................................14

*Jacobi Carbons AB v. United States*,
365 F. Supp. 3d 1323 (Ct. Int'l Trade 2019)................................ 22, 23

*Jacobi Carbons AB v. United States*,
365 F. Supp. 3d 1344 (Ct. Int'l Trade 2019)................................ 22, 23

*Jacobi Carbons AB v. United States*,
422 F. Supp. 3d 1308 (Ct. Int'l Trade 2019).......................................24

*Jacobi Carbons AB v. United States*,
422 F. Supp. 3d 1318 (Ct. Int'l Trade 2019).......................................24

*Jacobi Carbons AB v. United States*,
619 F. Appx. 992 (Fed. Cir. 2015) .......................................................45

*Jiaxing Bro. Fastener Co. v. United States*,
822 F.3d 1289 (Fed. Cir. 2016) ..................................................... *passim*

*Nan Ya Plastics Corp. v. United States*,
810 F.3d 1333 (Fed. Cir. 2016) ................................................... 14, 50

*Nation Ford Chem. Co. v. United States*,
166 F.3d 1373 (Fed. Cir. 1999) ........................................................5, 14

*Qingdao Sea-Line Trading Co. v. United States*,
766 F.3d 1378 (Fed. Cir. 2014) ................................................... *passim*

*QVD Food Co. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011) ................................................... *passim*

*Shenzen Xinboda Indus. Co. v. United States*,
456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020) ....................................42

*SolarWorld Americas, Inc. v. United States*,
910 F.3d 1216 (Fed. Cir. 2018) .............................................64

*T. T. Int'l v. United States*,
439 F. Supp. 3d 1370 (Ct. Int'l Trade 2020) ....................................28

*U.S. Steel Corp. v. United States*,
621 F.3d 1351 (Fed. Cir. 2010) .............................................5

*United States v. Eurodif*,
555 U.S. 305 (2009) .......................................................13

*Weishan Hongda Aquatic Food Co. v. United States*,
917 F.3d 1353 (Fed. Cir. 2019) ............................................... *passim*

*Yantai Oriental Juice Co. v. United States*,
26 C.I.T. 605 (2002) .......................................................59

*Zenith Elecs. Corp. v. United States*,
988 F.2d 1573 (Fed. Cir. 1993) ......................................... 58, 59

## Statutes

19 U.S.C. § 1673 ...........................................................4, 5

19 U.S.C. § 1675(a)(2)(A)(ii) ...............................................4,

19 U.S.C. § 1677b(c) ....................................................... *passim*

19 U.S.C. § 1677(35)(A) .....................................................5

## Regulations

19 C.F.R. § 351.408(c)(2) ..................................................7, 47

## Administrative Determinations

*Certain Activated Carbon from the People's Republic of China*,
  86 Fed. Reg. 73,731 (Dep't of Commerce Dec. 28, 2021)............................3, 10

*Certain Activated Carbon from the People's Republic of China*,
  86 Fed. Reg. 33,988 (Dep't of Commerce June 28, 2021)...............................8,9

*Certain Activated Carbon from the People's Republic of China*,
  72 Fed. Reg. 20,988 (Dep't of Commerce Apr. 27, 2007)....................................

*Initiation of Antidumping and Countervailing Duty Administrative
  Reviews*, 85 Fed. Reg. 35,068 (Dep't of Commerce June 8, 2020) ....................7

*Certain Fabricated Structural Steel Final Affirmative Determination
  of Sales at Less Than Fair Value*, 85 Fed. Reg. 5,376
  (Dep't of Commerce Jan. 30, 2020) ............................................................34, 35

## Other Authorities

Import Administration, U.S. Dep't of Commerce, Non-Market Economy Surrogate
Country Selection Process, Policy Bulletin 04.1 (2004), *available at*
  https://enforcement.trade.gov/policy/bull04-1.html
  (last visited March 10, 2024)......................................................................*passim*

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5, counsel for defendant-appellee the United States states that she is unaware of any other appeal in or from these actions that previously was before this Court, or any other appellate court, under the same or similar title. Defendant-appellee's counsel is also unaware of any case pending in this or any other court that may directly affect or be affected by the Court's decision in this appeal.

At the same time, counsel for the United States is aware of an action before this Court that counsel understands is not "related" within the meaning of the Court's rule, but involves an issue similar to one raised in this appeal (in the context of that case's separate administrative record). In *Carbon Activated Tianjin Co. v. United States*, No. 21-00131 (Ct. Int'l Trade), plaintiffs-appellants challenged the Department of Commerce's determination in the twelfth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China. This case is currently on appeal in *Carbon Activated Tianjin Co. v. United States*, No. 2023-2135 (Fed. Cir.).

**STATEMENT OF THE ISSUES**

1.      Whether the Department of Commerce's determination that Malaysia was the only "significant producer" of subject merchandise pursuant to 19 U.S.C. § 1677b(c)(4) among the six potential surrogate countries was supported by substantial evidence and in accordance with law.

2.      Whether Commerce's determination to base financial ratios in the surrogate value calculation on the financial statements of two Malaysian producers of subject merchandise — Century Chemical Works Sendirian Berhad (Century Chemical) and Bravo Green Sdn. Bhd. (Bravo Green) — was supported by substantial evidence and in accordance with law.

3.      Whether Commerce's valuation of carbonized materials based on Malaysian import data under Harmonized Tariff Schedule (HTS) 4402.90.1000 ("Coconut Shell Charcoal") was supported by substantial evidence and in accordance with law.

4.      Whether Commerce's valuation of coal tar based on Malaysian import data under HTS 2706.00 ("Mineral Tars, Including Reconstituted Tars") was supported by substantial evidence and in accordance with law.

5.      Whether Commerce's valuation of hydrochloric acid (HC1) based on Malaysian import data under HTS 2806.10 ("Hydrogen Chloride (hydrochloric acid)") was supported by substantial evidence and in accordance with law.

6.     Whether Commerce's valuation of steam based on Malaysian import data under HTS 2711.11, which covers natural gas in liquid form, was supported by substantial evidence and in accordance with law.

7.     Whether Commerce's determination to value ocean freight on the basis of Maersk Line freight charge quotes was supported by substantial evidence and in accordance with law.

## STATEMENT OF THE CASE[1]

This appeal concerns Commerce's final results in the thirteenth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.  *See Certain Activated Carbon from the People's Republic of China*, 86 Fed. Reg. 73,731 (Dep't of Commerce Dec. 28, 2021) (*Final Results*) (Appx7969-7970), and the accompanying Issues and Decision Memorandum (IDM) (Appx7887-7937).

Plaintiffs-appellants Carbon Activated Tianjin Co., Ltd. (Carbon Tianjin) and Carbon Activated Corporation (Carbon Activated) (collectively, CAT) appeal the judgment of the United States Court of International Trade sustaining Commerce's determinations: (1) that Malaysia was the only "significant producer"

---

[1]  Pursuant to Federal Rule of Appellate Procedure 28(b) and Federal Circuit Rule 28(b), we include statements of the case and facts because we disagree with plaintiffs-appellants' statement of the case and facts.

2

of activated carbon among the six potential surrogate countries; (2) to base financial ratios in the surrogate value calculation on the financial statements of Malaysian producers Century Chemical and Bravo Green; (3) to value carbonized materials based on Malaysian import data under HTS 4402.90.1000 ("Coconut Shell Charcoal"); (4) to value coal tar based on Malaysian import data under HTS 2706.00 ("Mineral Tars, Including Reconstituted Tars"); (5) to value hydrochloric acid (or HC1) based on Malaysian import data under HTS 2806.10 ("Hydrogen Chloride (hydrochloric acid)"); (6) to value steam based on Malaysian import data under HTS 2711.11, which covers natural gas in liquid form; and (7) to value ocean freight on the basis of Maersk Line freight charge quotes. *Carbon Activated Tianjin Co., Ltd. v. United States*, 650 F. Supp. 3d 1354 (Ct. Int'l Trade 2023) (Appx7-50).

## STATEMENT OF FACTS

### I.    Legal Framework For Surrogate-Country And Surrogate-Value Selection

The antidumping duty statute is a remedial scheme that applies duties to foreign goods sold, or likely to be sold, in the United States "at less than its fair value." 19 U.S.C. § 1673. Commerce is responsible for investigating whether there have been, or are likely to be, sales at less-than-fair value. *Id.* § 1673(1). When determining that there have been such sales, Commerce issues an antidumping order. *Id.*

3

Once Commerce issues an antidumping duty order (*see id.* §§ 1673a,

1673b(b), (d), 1673d(a), (c)), it conducts administrative reviews, such as the

subject review, to determine the amount of duties owed. *Id.* § 1675(a)(1), (2)(A).

In so doing, Commerce calculates a "dumping margin" for each entry of subject

merchandise under review. *Id.* § 1675(a)(2)(A)(ii). A dumping margin is the

amount by which the "'normal value' (the price a producer charges in its home

market) exceeds the 'export price' (the price of the product in the United States) or

'constructed export price.'" *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353

(Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A)).

In antidumping proceedings involving nonmarket economy countries such as

China, Commerce calculates the normal value of the subject merchandise based on

surrogate values available in a comparable market economy. *Jiaxing Bro.*

*Fastener Co. v. United States*, 822 F.3d 1289, 1292 (Fed. Cir. 2016) (citing 19

U.S.C. § 1677b(c)(1)). Commerce calculates the surrogate values by valuing

certain "factors of production" such as raw materials used in producing the

merchandise in a comparable market economy. *Id.* (citing 19 U.S.C.

§ 1677b(c)(4)). "In essence, Commerce seeks to construct a hypothetical normal

value for the merchandise that is uninfluenced by the nonmarket economy." *Id.* at

1292-93 (citing *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375

(Fed. Cir. 1999) & 19 U.S.C. § 1677(18)(A) (defining "nonmarket economy

country")).  To do this, Commerce selects a market economy country as the primary surrogate country.  *Id.* at 1293 (citing 19 C.F.R. § 351.408(c)(2)).  The process of selecting a market economy country to value the factors of production is referred to as surrogate country selection.  *Id.* (citing *Dorbest Ltd.*, 604 F.3d at 1368).

Pursuant to 19 C.F.R. § 351.408(c)(2), generally, Commerce values all factors of production in a single surrogate country.  Commerce follows a four-step process to select a surrogate country:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at a comparable level of economic development to the {non-market economy} country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)–(3), Commerce will select the country with the best factors data.

*Jiaxing Bro. Fastener Co.*, 822 F.3d at 1293 (cleaned up) (quoting Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), http://enforcement.trade.gov/policy/bull04–1.html (last visited March 10, 2024)) (Policy Bulletin 04.1)).

The statute requires Commerce to value the factors of production through "the best available information" in the market economy.  *Id.* (citing 19 U.S.C. § 1677b(c)(1)).  This Court has held that Commerce possesses the discretion to

determine what constitutes "the best available information" because this term is not defined by statute. *Id.* (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011)). "The question here is not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Id.* at 1300-01 (citation omitted).

In selecting its surrogate values, Commerce generally prefers publicly-available and "non-proprietary information from producers of identical or comparable merchandise in the surrogate country." 19 C.F.R. § 351.408(c)(1), (4). "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Jiaxing Bro. Fastener Co.*, 822 F.3d at 1293 (quoting *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014)). Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable." *Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1332-33 (Ct. Int'l Trade 2014) (citations omitted), *aff'd*, *Jiaxing*, 822 F.3d 1289.

Using the best available information, Commerce "*shall* {value the factors of production} to the extent possible . . . in one or more market economy countries that are — (A) at a level of *economic* development comparable to that of the

nonmarket economy country, *and* (B) significant *producers* of comparable merchandise." *Id.* (quoting 19 U.S.C. § 1677b(c)(4)(A)-(B) (emphases and bracketing added by the Court).

Neither the statute nor Commerce's regulations provide further guidance on the definition of "significant producer." *See, e.g., Fresh Garlic Producers Ass'n v United States*, 121 F. Supp. 3d 1313, 1338-39 (Ct. Int'l Trade 2015). In light of this statutory and regulatory gap, Commerce looks to Policy Bulletin 04.1 related to surrogate-country selection for guidance in defining "significant producer." Relying on the relevant legislative history, Policy Bulletin 04.1 provides that "'significant producer' includes any country that is a 'significant net exporter.'" Policy Bulletin 04.1 at 1. Policy Bulletin 04.1 also defines "net exporter" as "a country whose exports exceed its imports." *Id.* at 5 n.1. Policy Bulletin 04.1 further provides, in pertinent part:

> The extent to which a country is a *significant* producer should not be judged against the {subject non-market economy} country's production level or the comparative production of the five or six countries {that are considered potential surrogate countries}. Instead, a judg{ }ment should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics). Since these characteristics are specific to the merchandise in question, the standard for "significant producer" will vary from case to case.

*Id.* at 3 (emphasis in the original).

7

Based on its preference to use surrogate values from a single surrogate country pursuant to 19 C.F.R. § 351.408(c)(2), when several countries are both at a level of economic development comparable to the nonmarket economy country and significant producers of comparable merchandise, Commerce evaluates the reliability and completeness of the data in the similarly-situated surrogate countries, and generally selects the one with the best data as the primary surrogate country. *Jiaxing*, 822 F.3d at 1294 (citing Policy Bulletin 04.1).

## II.    Administrative Background

### A.    Initiation Of The Thirteenth Administrative Review And Surrogate Value Selection

In April 2007, Commerce published the antidumping duty order covering the subject merchandise. *Certain Activated Carbon from the People's Republic of China*, 72 Fed. Reg. 20,988 (Dep't of Commerce Apr. 27, 2007) (notice of order) (order).  In June 2020, Commerce initiated the subject review. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 35,068 (Dep't of Commerce June 8, 2020).  Commerce selected plaintiff-appellant Carbon Tianjin, as well as Datong Juqiang Carbon Activated Co., as mandatory respondents for individual examination.  Appx6887.

On January 19, 2021, Commerce requested comments from interested parties on Commerce's list of economically comparable countries, surrogate value country selection, and surrogate value data.  Appx6895.  Commerce identified

8

Brazil, Malaysia, Mexico, Romania, Russia, and Turkey (collectively, OP List

Countries) as economically comparable countries. Appx6896. Petitioners and

mandatory respondents submitted comments on economically comparable

countries on February 11, 2021, and surrogate value comments on March 4, 2021.

Appx6895. In their surrogate country comments, CAT and the other mandatory

respondent stated that, of the six OP List Countries, only Malaysia was a net

exporter of activated carbon in terms of both quantity and value. Appx6896 (citing

Appx917-918, Appx1193).

### B.    Preliminary Results

On June 28, 2021, Commerce published the *Preliminary Results*,

determining that certain activated carbon from China was sold in the United States

at less than normal value during the period of review. *See Certain Activated

Carbon from the People's Republic of China*, 86 Fed. Reg. 33,988 (Dep't of

Commerce June 28, 2021) (*Preliminary Results*) (Appx7374-7378), and

accompanying Preliminary Decision Memorandum (June 21, 2021) (PDM)

(Appx6885-6916). Commerce preliminarily selected Malaysia as the primary

surrogate country. Appx6902. Commerce found that all six OP List Countries met

the requirement for economic comparability, and that the record evidence

demonstrated Malaysia to be the only significant producer of comparable

merchandise because Malaysia was the only net exporter of activated carbon

9

during the period of review. Appx6899-6901. Further, Commerce found that Malaysia had reliable and usable data to value all factors of production and to calculate surrogate financial ratios. Appx6902. Thus, Commerce found that Malaysia satisfied the statutory requirements under 19 U.S.C. § 1677b(c)(4) to be selected as the primary surrogate country to value the respondents' factors of production. *Id.*

Commerce calculated normal value using surrogate values for material inputs primarily based on Malaysian import statistics published in the Global Trade Atlas (GTA). Appx6912; Appx6921. Commerce also calculated surrogate financial ratios using the financial statements of two Malaysian producers of activated carbon, Century Chemical and Bravo Green. Appx6915-6916. For valuing international freight charges, Commerce relied on ocean freight quotes from Maersk for transportation between Tianjin, China, and various U.S. ports, because these rates covered the entire period of review. Appx7929; Appx6925.

## C.    <u>Final Results</u>

On December 28, 2021, Commerce published the *Final Results* in which it continued to find that Malaysia was the only significant producer of activated carbon and continued to find that it was appropriate to rely on financial statements from Malaysia in calculating surrogate financial ratios. 86 Fed. Reg. at 73,371; Appx7913-7914. Commerce also continued to value factors of production using

10

Malaysian imports under the HTS subheadings used in the *Preliminary Results*, and to value the mandatory respondents' ocean freight expenses using the Maersk data.  Appx7918, Appx7925-7935.

### III.    Trial Court Proceeding

On appeal to the Court of International Trade, CAT and the other mandatory respondent challenged Commerce's significant-producer determination and seven of its surrogate-value selections.  In July 2023, the trial court sustained Commerce's determination that Malaysia was the only significant producer of activated carbon among the six OP List Countries.  *Carbon Activated Tianjin Co.*, 650 F. Supp. 3d at 1364.  The trial court also held that Commerce's surrogate-value selections to value financial ratios, carbonized material, coal tar, hydrochloric acid, steam, ocean freight, and bituminous coal were supported by substantial evidence.  *Id.* at 1364-1376.  On the same day, the Court entered judgment in favor of the United States.  Appx5-6.  This appeal followed, challenging all Commerce's determinations except its determinations related to bituminous coal.

### SUMMARY OF THE ARGUMENT

The Court should affirm the trial court's judgment sustaining Commerce's determination that Malaysia was a significant producer of comparable merchandise, and sustaining Commerce's surrogate-value determinations related to

the valuations of financial ratios, carbonized material, coal tar, hydrochloric acid, steam, and ocean freight.  CAT has failed to identify any trial court error.  Rather, CAT's challenges are not supported by the record or governing law, and reflect nothing more than disagreement with Commerce's judgement calls in weighing the record evidence in an area in which the agency possesses broad discretion.

First, CAT contends that Commerce unlawfully relied exclusively on the net-producer criterion in determining that Malaysia was the only significant producer of subject merchandise.  CAT misreads the record.  In addition to its net-exporter finding, Commerce's significant-producer determination was based on its comparative analysis of all the financial statements on the record, which established that only the financial statements of the Malaysian companies demonstrated that their principal business activity was the manufacture and sale of activated carbon.

CAT also contends that Commerce's significant-producer analysis was flawed because the agency failed to consider that Romania offered "superior" data.  But this Court has recognized that Policy Bulletin 04.1 provides that "{d}ata {c}onsiderations" only come into play "if more than one country has survived the selection process to this point" related to comparable merchandise and significant producer.  Because only Malaysia satisfied these criteria, Commerce was not required to turn to data considerations.

In the highly discretionary area of surrogate-value selection, CAT challenges Commerce's selection of surrogate financial ratios, the surrogate valuation of four activated-carbon inputs — carbonized material, coal tar, hydrochloric acid, and steam, as well as the selection of surrogate ocean freight charges. In focusing on the imperfections of Commerce's surrogate value selections, CAT fails to recognize that Commerce's selections need not be perfect under the governing standard. CAT's arguments in favor of alternative datasets are not supported by law or the record, but merely reflect disagreements with Commerce's lawful exercise of its discretion to weigh the evidence. Accordingly, the Court should affirm the trial court's judgment in its entirety.

## ARGUMENT

## I.    Standard Of Review

The Court applies the same standard of review that was applied by the trial court. *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005). Accordingly, the Court will uphold Commerce's determination "unless it is unsupported by substantial record evidence or is not in accordance with the law." *Id.* (citing 19 U.S.C. § 1516a(b)(1)(B)(i)); *see also United States v. Eurodif*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies . . . are conclusive unless unsupported by substantial evidence.").

While Commerce must defend its surrogate choices, an interested party arguing that data is aberrational or unreliable bears the burden of supporting its argument with sufficient evidence. *See Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241, 1254 (Ct. Int'l Trade 2021) (citing *QVD Food Co.*, 658 F.3d at 1324 (recognizing that when there is insufficient evidence to determine certain data aberrational or unreliable, Commerce has no basis for rejecting the data). "The burden of creating an adequate record lies with interested parties and not with Commerce . . . {;} {this} burden on interested parties stems from the fact that the International Trade Administration, the relevant agency within Commerce, has no subpoena power." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1338 (Fed. Cir. 2016) (cleaned up).

The data that Commerce relies on need not be perfect. *Jiaxing*, 822 F.3d at 1301 (citing *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)). Nor is Commerce required to duplicate the precise experience of the manufacturer in the non-market economy. *Nation Ford*, 166 F.3d at 1377 (cleaned up). Commerce "need not prove that its methodology was the only way or even the best way to calculate surrogate values for factors of production as long as it was a reasonable way." *Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfr. v. United States*, 44 F. Supp. 2d 229, 258 (Ct. Int'l Trade 1999).

14

## II.     Commerce's Determination That Malaysia Was The Only "Significant Producer" Of Activated Carbon Was Supported By Substantial Evidence And Otherwise Lawful

CAT raises several challenges to Commerce's significant-producer determination, all of which lack merit.  *See* CAT Br. at 14-26.

### A.     The Trial Court Did Not Err In Sustaining Commerce's Determination

Applying the guidance set forth in Policy Bulletin 04.1, Commerce determined that only Malaysia was a net exporter of activated carbon among the list of potential surrogate countries — both in terms quantity and value — during the period of review.  Appx7919 (citing Appx917-918, Appx1193).  Specifically, Commerce based its significant-producer determination on its examination of import and export data published by the GTA (for Malaysia, Mexico, Russia, Brazil and Turkey) and TDM (for Romania), which indicated that, of the six OP List Countries, only Malaysia was a net exporter of activated carbon during the period of review.  *Id.*  In fact, before Commerce, CAT and the other mandatory respondent agreed that, of the OP List countries, only Malaysia was a net exporter of activated carbon.  Appx6901 (citing Appx917-918, Appx1193).

In addition to its net-exporter finding, Commerce's significant-producer determination was informed by the financial statements on the record from two Malaysian companies and one Romanian company.  Appx7920 (citing Appx3708-3790).  Commerce found that only the Malaysian financial statements provided

15

evidence of significant production of activated carbon in terms of both quantity and value. *Id.*

In sustaining Commerce's significant-producer determination, the trial court relied on both of Commerce's findings related to this issue. In finding that Malaysia was the only country on the OP List that that was a "net exporter," the trial court found that such "a metric . . . is both supported by Commerce's policy and indicative of Malaysia having produced sufficient activated carbon to ensure that it exported more than it imported." *Carbon Activated Tianjin Co.*, 650 F. Supp. 3d at 1364 (citing Appx7919-7920 & Policy Bulletin 04.1). The trial court observed that, in addition to this metric, Commerce relied on financial statements on the record to determine whether OP List countries were "significant producers{,}" comparing the Malaysian financial statements to the Romcarbon financial statement. *Id.* (citing Appx7920 & Appx6901). Commerce found that the Romcarbon financial statement indicated that activated carbon was not Romcarbon's principal manufacturing activity and, thus, did not constitute evidence of "significant production" of activated carbon in Romania. *Id.* (citing Appx7920).

### B.    CAT Fails To Identify Trial Court Error

In attempting to assign trial-court error, CAT relies on several misstatements of the law governing the statutory "significant producer" element of 19 U.S.C.

16

§ 1677b(c)(4), of the policy guidance Commerce relies on to interpret that element, and of the record evidence.  Specifically, CAT contends that Commerce's determination that only Malysia was a significant producer was unlawful because: (1) Commerce considered only whether OP list countries were "net exporters" of activated carbon in contravention of Policy Bulletin 04.1; (2) Commerce engaged in a comparison of OP list countries in contravention of Policy Bulletin 04.1; (3) Commerce could have determined that Romania was a significant producer based on its exports alone; and (4) Policy Bulletin 04.1 required Commerce to consider data quality before making its significant-producer determination.  *See* CAT Br. at 11-26.  CAT's arguments lack merit.

First, CAT contends that Commerce unlawfully determined Malaysia was a significant producer because, upon finding that Malaysia was the only "net exporter" of activated carbon during the period of review, the agency "disregard{ed} financial statements from other countries . . . showing significant exports during the {period of review} by other countries{.}"  CAT Br. at 12-13; *see also id.* at 21 (contending that Romania was unlawfully disqualified on this basis).  In determining that Malaysia was a "significant producer," Commerce also considered all the financial statements on the record, and found that only the Malaysian financial statements provided evidence of significant production of activated carbon.  Appx7920 (citing Appx3708-3790).

Further, Commerce's determination that Malaysia was a significant producer based on net exports was lawful and supported by the administrative record. Policy Bulletin 04.1 expressly provides that "'significant producer' includes any country that is a 'significant net exporter.'" Policy Bulletin at 1; *see also id.* at 3 ("'significant producer' could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers"). Policy Bulletin 04.1 also defines "net exporter" as "a country whose exports exceed its imports." *Id.* at 5 n.1. As the trial court explained, "Policy Bulletin 04.1 also lists examples of production levels that would make a country a 'significant producer,' including being a 'significant net exporter.'" *Carbon Activated Tianjin Co.*, 650 F. Supp. 3d at 1363 (citing Policy Bulletin 04.1 at 1 (discussing H.R. Rep. No. 100-576, at 590 (1988) (Conf. Rep.))).

As for CAT's contention that Commerce unlawfully "disregarded record evidence showing significant exports during the {period of review} by other countries{ }" (*see* CAT Br. at 13), the agency was not required to base its significant-producer determination on export volumes. Commerce has done so as a proxy for domestic production in a previous review under this order only because none of the countries in the OP List were net exporters of activated carbon. Specifically, in the eleventh administrative review, the record contained the import and export quantity and value data during the period of review for all six OP List

Countries, which demonstrated that none of those countries were net exporters of activated carbon. *See Carbon Activated Tianjin Co. v. United States*, Court No. 20-00007 (Ct. Int'l Trade), Remand Redet. at 8, ECF No. 68. Because world production and trade data of comparable merchandise were not available on the record of that administrative review, on remand, Commerce analyzed exports of comparable merchandise from the six OP List Countries as a proxy for production data. *Id.* at 13.

On the record of this administrative review, however, there was no need for Commerce to analyze exports of comparable merchandise from the six OP List Countries as a proxy for production data because the agency was able to make a net-exporter determination; Commerce found that the import and export data for the six OP List Countries on the record established that *solely* Malaysia was a net exporter of activated carbon among the OP List Countries — both in terms quantity and value. Appx7919 (citing Appx917-918, Appx1193).

CAT also contends that Commerce engaged in a "rigid application of the 'net exporter' test{,}" which it asserts "is contrary to the agency's own policy and practice" because Policy Bulletin 04.1 provides that "{t}he extent to which a country is a significant producer should not be judged against the NME country's production level or comparative production of the five or six countries on the OP's surrogate country list." CAT Br. at 16 (quoting Policy Bulletin 04.1); *see also id.*

19

at 17, 23-24.  But Commerce did not base its significant-producer finding on the comparative production of the potential surrogate countries on the OP list.  Rather, as discussed above, Commerce determined that Malaysia was a significant producer because it was the only net exporter of activated carbon among the list of potential surrogate countries, and because only the financial statements of the Malaysian companies demonstrated that their principal business activity was the manufacture and sale of activated carbon.  Appx7919 (citing Appx917-918, Appx1193); Appx7920.

CAT further contends that, based on Policy Bulletin 04.1, Commerce erroneously disregarded the "superior" quality of the Romanian financial statements in making its significant-producer determination.  CAT Br. at 13-16.  CAT misreads Policy Bulletin 04.1.  This Court has held that, under Policy Bulletin 04.1, "{d}ata {c}onsiderations" only come into play "if more than one country has survived the selection process to this point" related to comparable merchandise and significant producer.  *Jiaxing*, 822 F.3d at 1294 (citing Policy Bulletin 04.1).  Thus, once Commerce determined that Malaysia produced comparable merchandise and was the sole OP List Country that was a significant producer of activated carbon, Commerce lawfully concluded that it was not required to provide further analysis on data availability and reliability.  Appx6908, Appx6909.

20

Even assuming that CAT were correct that Romania's financial statements constitute "superior" data, this Court and the trial court have previously rejected CAT's argument that Commerce is required to select the primary surrogate country on this basis. Rather, in the eleventh administrative review, the trial court held that, "{a}t most, these examples show that Commerce *may* consider the source of financial ratios to determine the primary surrogate country, not that Commerce *must*." *Carbon Activated Tianjin Co. v. United States*, 547 F. Supp. 3d 1310, 1321 (Ct. Int'l Trade 2021); *see also id.* ("Indeed, Carbon Activated has not cited, and this court cannot find, any authority indicating that Commerce must base the selection of a primary surrogate country on the quality of financial data."), *aff'd*, No. 22-1298, 2023 WL 3166188, at *3-4 (Fed. Cir. May 1, 2023).

Also without merit is CAT's contention that, pursuant to Policy Bulletin 04.1, "the criterion of 'significant producer of comparable merchandise' is generally emphasized only in those cases that 'involve subject merchandise that is unusual or unique" whereas in cases like this one in which the inputs are unexceptional, "Commerce is required to apply a sliding scale and apply an attenuated product requirement when examining potential surrogate countries." CAT Br. at 16-17. CAT appears to be misinterpreting a section of the Policy Bulletin 04.1 entitled "Exceptions to the Sequencing Procedure." Policy Bulletin 04.1 at 4. Although, generally, in the surrogate-country selection process,

Commerce considers whether potential surrogate countries are economically comparable to the non-market economy country at issue before turning to its significant-producer determination, this Policy Bulletin 04.1 section recognizes an exception to this sequencing whereby "it is more appropriated for {Commerce} to address economic comparability only *after* the significant producer of comparable merchandise requirement is met." *Id.* (emphasis in the original). The Policy Bulletin further explains that "{c}ases where particular emphasis on 'significant producer of comparable merchandise' is warranted are generally those that involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production){.}" *Id.* CAT's interpretation of this section of the Policy Bulletin to somehow lessen the significance of the "significant producer" element of 19 U.S.C. § 1677b(c)(4) in this case is belied by the plain language of the section.

Next, relying on *Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323 (Ct. Int'l Tr. 2019), and *Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1344 (Ct. Int'l Tr. 2019), CAT contends that "{t}he Trade Court has previously rejected Commerce's fixation on the 'net exporter' criterion as the basis for selecting a surrogate value." CAT Br. at 17-18. CAT further contends that, in both cases, as here, "Commerce improperly relied on net exports as a proxy for production." *Id.* at 24. Those cases are inapposite because, there, the trial court found Commerce's

net-producer analysis required further explanation. *See Jacobi Carbons AB*, 365 F. Supp. 3d at 1333 (holding that Commerce failed to explain why it found that Thailand was a significant producer based on its net export quantity of 1,172,897 kg given that the record also contained evidence that the Philippines and Indonesia had net export quantities of 60,662,341 kg, and 11,112,825 kg, respectively); *id.* (faulting Commerce for "declar{ing} all three countries to be significant producers without addressing the disparities between their net export quantities"); *see also Jacobi Carbons AB*, 365 F. Supp. 3d at 1350-51 (remanding because Commerce determined that Thailand was a significant producer despite failing to satisfy either of the agency's stated metrics in that proceeding for evaluating whether a country was a significant producer — being a net exporter or a major exporter to the United States).

In this case, however, Commerce found that Malaysia was a significant producer for two reasons: based on record evidence that Malaysia was a net exporter in terms of quantity and value and based on its analysis of the Malaysian and Romanian financial statements on the record showing that only the Malaysian companies were significant producers of activated carbon. Appx7919 (citing Appx917-918, Appx1193). Based on Commerce's comparison of the two Malaysian financial statements to the Romcarbon financial statement, Commerce found that activated carbon was not Romcarbon's principal manufacturing activity

23

and, thus, did not establish "significant production" of activated carbon in

Romania.  Appx7920.

Relying on remand proceedings related to the seventh and eighth

administrative reviews in *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d

1308, 1311 (Ct. Int'l Trade 2019), and *Jacobi Carbons AB v. United States*, 422 F.

Supp. 3d 1318, 1321 (Ct. Int'l Trade 2019), CAT asserts that Commerce's

selection of Malaysia as principal surrogate country in this case was equally

cursory and unsupported by substantial evidence as in those cases.  CAT Br. at 19

& n.10.  Neither of those decisions addressed surrogate country selection.

CAT also misstates the *Preliminary Results* in contending that "the record

contains 'direct evidence of production of identical, and therefore comparable

merchandise' in Romania during the {period of review}."  CAT Br. at 22 (quoting

6901).  The *Preliminary Results* made that statement in reference to Malaysia —

*not* Romania:

> Commerce preliminarily finds that Malaysia is the only
> country on the OP List Countries that is a significant
> producer of comparable merchandise pursuant to section
> 773(c)(4)(B) of the Act, as Malaysia is the only net
> exporter among the OP List Countries, *and provides
> more direct evidence of production of identical, and
> therefore, comparable merchandise in the form of
> financial statements from more than one Malaysian
> company.*

Appx6901 (emphasis added).  Although CAT interprets the Romcarbon financial

statement to reflect significant production of activated carbon in Romania (*see*

CAT Br. at 22), Commerce arrived at a different conclusion in analyzing the same

financial statement.  Specifically, Commerce found that, although Romcarbon's

profit center no.2 includes an "Active Coal Workshop" dedicated to the production

of activated carbon, its financial statement indicates that its principal activities are

the manufacture of polyethylene, polypropylene, polyvinyl chloride, polystyrene

processing, filters and protective materials.  Appx6901 (citing Appx2372-2678).

CAT's differing interpretation of record evidence does not render Commerce's

interpretation unsupported by substantial evidence.  *See, e.g.*, *Qingdao Sea-Line*

*Trading Co.*, 766 F.3d at 1385 ("An agency finding may still be supported by

substantial evidence even if two inconsistent conclusions can be drawn from the

evidence.") (citing cases).

    CAT also contends that Commerce contravened 19 U.S.C. § 1677b(c)(4) in

determining that Malaysia was a significant producer because it had "the maximum

number of companies producing identical merchandise."  CAT Br. at 24 (citing

Appx6901).  Commerce made no such finding that Malaysia was a significant

producer because it had "the maximum number of companies producing identical

merchandise."  Rather, Commerce found that Malaysia was a significant producer

based on two findings:  "Malaysia is the only net exporter among the OP List

Countries, and provides more direct evidence of production of identical, and

therefore, comparable merchandise in the form of financial statements from more

than one Malaysian company."  Appx6901.

CAT further contends that Commerce contravened the trial court's holding

that made "{s}imilar findings" in *Carbon Activated Tianjin Co. v. United States*,

503 F. Supp. 3d 1278 (Ct. Int'l Tr. 2021), related to the eleventh administrative

review.  CAT Br. at 24-26.  That case is distinguishable.  In *Carbon Activated*

*Tianjin Co.*, Commerce failed to adequately explain or support with substantial

evidence its selection of Malaysia and rejection of Romania as the primary

surrogate country.  503 F. Supp. 3d at 1286.  Specifically, the trial court found that,

while Commerce stated that it "analyzed exports of comparable merchandise from

the six OP List countries," the agency failed to explain its analysis or state any

findings.  *Id.*  In that case, the trial court also took issue with Commerce's finding

that "Malaysia provides the best available information . . . because it is the only

country on the OP List that is a significant producer of *identical* merchandise"

given that Commerce failed to explain why "favor{ing} the production of identical

merchandise when selecting a primary surrogate country . . . comports with the

plain statutory language or constitutes a permissible interpretation thereof."  *Id.*

(emphasis in the original).  In that case, Commerce also failed to explain why it

changed its preliminary finding that Romania was a substantial producer of subject

merchandise based on net export quantity to a final determination that it was not. *Id.* at 1287. In this case, Commerce fully explained its reasoning for selecting Malaysia as the primary surrogate country, and that rationale did not turn on Malaysia's production of identical merchandise. Appx7918-7922.

Finally, CAT contends that, on remand in the eleventh administrative review, Commerce reversed itself, and found all OP list countries, including Romania, to be significant producers; found that Romcarbon's Profit Center 2, the "Active Coal Workshop" was dedicated to production of activated carbon; and found that Romcarbon's financial statement on the record provided evidence of domestic production under 19 U.S.C. § 1677b(c)(4). CAT Br. at 26. CAT fails to explain how Commerce's findings on that record are relevant to this case given that "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Jiaxing*, 822 F.3d at 1299 (quoting *Qingdao Sea-Line*, 766 F.3d at 1387).

## III. Substantial Evidence Supports Commerce's Selection Of The Surrogate Values

In the highly discretionary area of surrogate-value selection, CAT challenges Commerce's selection of surrogate financial ratios, the surrogate valuation of four activated-carbon inputs — carbonized material, coal tar, hydrochloric acid, and steam, as well as the selection of surrogate ocean freight charges. CAT's arguments in favor of alternative datasets are not supported by the record, but

merely reflect disagreements with Commerce's lawful exercise of its discretion to weigh the evidence.

### A. Substantial Evidence Supports Commerce's Selection Of Surrogate Financial Ratios

CAT challenges Commerce's determination to use financial statements from two Malaysian producers of activated carbon — Century and Bravo Green — to value financial ratios. CAT Br. at 10-34. As demonstrated below, the record supports Commerce's selection.

### 1. The Trial Court Did Not Err In Sustaining Commerce's Determination

In a non-market economy antidumping proceeding, Commerce determines normal value on the basis of factors of production used to produce subject merchandise valued in a surrogate country or countries. *See* 19 U.S.C. § 1677b(c)(1). After calculating the total value of the factors of production, Commerce adds "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id*. Commerce does this by calculating surrogate financial ratios that it "derives from the financial statements of one or more companies that produce identical or comparable merchandise, preferably in the primary surrogate country." *T. T. Int'l v. United States*, 439 F. Supp. 3d 1370, 1382 (Ct. Int'l Trade 2020) (citing *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010)).

The administrative record contained four financial statements:  two from Malaysia, one from Romania, and one from Russia.  Appx7919-7920 (citing Appx3708-3790; Appx2372-2678; Appx1550-1565).  In sustaining Commerce's selection of the Malaysian financial statements, the trial court found that Commerce compared Romcarbon's financial statement to those of Century and Bravo Green.  *Carbon Activated*, 650 F. Supp. 3d at 1364 (citing Appx7920-7922). The trial court recognized that Commerce had acknowledged that the Malaysian financial statements were "not as detailed" as Commerce preferred, but that they "provide{d} sufficient information to calculate surrogate ratios for factory overhead costs, {selling, general, and administrative} expenses and profit." *Id.* (citing Appx7922).  The trial court also found that Commerce had explained that any lesser detail was outweighed by the fact that Century and Bravo Green's principal business activity was the manufacture and sale of subject merchandise; by Commerce's preference to use financial statements from the primary surrogate country; and by Commerce's preference to use financial statements from a country with multiple usable financial statements on the record.  *Id.* (citing Appx7921). Because Commerce adequately explained its selection of Century and Bravo Green's financial statements, the trial court concluded that Commerce's decision was supported by substantial evidence.  *Id.* at 1364-1365.

## 2.    CAT Fails To Identify Trial Court Error

CAT raises several challenges to the trial court's decision sustaining

Commerce's selection of the Malaysian financial statements over the Romanian

and Russian financial statements.  CAT Br. at 19-21, 26-34.  These arguments do

nothing more than ask this Court to reweigh the evidence, which is foreclosed by

the standard of review.

First, CAT contends that Commerce's determination in this case contains the

same infirmities as *Carbon Activated Tianjin Co. v. United States*, 586 F. Supp. 3d

1360 (Ct. Int'l Trade 2022), because, there, as here, Commerce declined to

consider the Romcarbon or JSC Sorbent financial statements merely because they

were not from Malaysia, the primary surrogate country.  CAT Br. at 19-21.  That

case is inapposite because, here, Commerce considered the Romcarbon and JSC

Sorbent financial statements, and rejected them for multiple reasons — not merely

because they were not from Malaysia.  In addition to meeting its regulatory

preference for valuing all factors of production in a single surrogate country,

Commerce selected the two Malaysian financial statements because they were

contemporaneous with the period of review, from the only country among the OP

List countries determined to be a significant producer of comparable merchandise,

and reflected the experience of a producer of merchandise identical to the

mandatory respondents.  Appx7918-7920.  Commerce also explained that the

Malaysian companies' financial statements provided sufficient information to calculate surrogate financial ratios for factory overhead, SG&A expenses, and profit. Appx7921; Appx6902-6916. Further, Commerce reasoned that use of the Malaysian financial statements was preferable to use of the financial statements from Romania and Russia based on Commerce's preference for using multiple financial statements. Appx7922.

Next, CAT challenges Commerce's reasoning that Romcarbon's production experience is not as similar to the mandatory respondents' production experience as the production experience of the two Malaysian producers of activated carbon, Century Chemical and Bravo Green. CAT Br. at 20-21. CAT contends that the difference in production experience was not related to production of activated carbon, but related to Romcarbon's production of other goods, as well. *Id.* at 21. CAT's argument glosses over Commerce's finding that Romcarbon's principal manufacturing activities are unrelated to activated carbon. Appx7920-7921. Commerce found that, although Romcarbon's profit center no.2 includes an "Active Coal Workshop" dedicated to activated-carbon production, its financial statement otherwise indicates that its principal activities are the manufacture of polyethylene, polypropylene, polyvinyl chloride, polystyrene processing, filters and protective materials. Appx7920 (citing Appx2372-2678). Commerce determined this was not evidence of Romcarbon's "significant production" of

31

activated carbon when compared to the two financial statements from the

Malaysian producers because the principal business activity of the two companies

is the manufacture and sale of activated carbon. *Id.*

CAT also contends that Commerce "effectively conceded" that the

Malaysian financial statements were inferior to the Romcarbon and JSC Sorbent

financial statements by previously concluding that Malaysian statements lacked

disaggregation and, thus, lacked "usable financial data." CAT Br. at 21 (citing

Appx7921). Commerce made no such concession. Commerce's reference in the

*Final Results* to a "lack usable financial data" relates to its finding from the

eleventh administrative review — *not* this one. Appx7921. Related to the twelfth

administrative review, as well as the thirteenth administrative review at issue in

this appeal, Commerce found that, "while the two Malaysian financial statements

are not as detailed as Commerce prefers . . . , these financial statements provide

sufficient information to calculate surrogate ratios for factory overhead costs,

SG&A expenses, and profit." *Id.* Commerce also explained that any lesser detail

was outweighed by Century and Bravo Green's principal business activity, which

was the manufacture and sale of subject merchandise, by Commerce's preference

to use financial statements from the primary surrogate country, and by

Commerce's preference to use financial statements from a country with multiple

usable financial statements on the record. *Id.*

In the *Final Results*, Commerce explained that it has reconsidered its position related to the disaggregation issue since the eleventh administrative review. Appx7921. In its eleventh administrative Final Results, Commerce chose the Romanian financial statements because the Malaysian financial statements lacked separate line items breaking down the cost of raw materials and energy. *Id.* In the twelfth administrative review Final Results, after further consideration, Commerce determined that, while the Malaysian statements were not as detailed as Commerce prefers, they provided sufficient information to calculate surrogate ratios for factory overhead costs, SG&A expenses, and profit. Appx7921-7922. Commerce further explained that, for this review, it found that the financial statements on the record from the primary surrogate country, Malaysia, are superior when compared to other available sources on the record because they meet Commerce's surrogate financial statement selection criteria in that they are complete, publicly available, from manufacturers of identical merchandise, and provide sufficient information for Commerce to calculate surrogate ratios. Appx7922.

CAT further contends that the Malaysian financial statements were insufficiently disaggregated as compared with the Romanian and Russian alternatives, thereby contravening the agency's practice of rejecting insufficiently disaggregated financial statements that contain basket category cost line items.

CAT Br. at 26-33.  CAT misstates Commerce's practice.  In *Weishan Hongda Aquatic Food Co. v. United States*, this Court sustained Commerce's calculation of financial ratios using a financial report that did not disaggregate cost categories — that is, further breakout certain cost categories into itemized expenses.  *See* 917 F.3d 1353, 1368 (Fed. Cir. 2019) ("conclud{ing} Commerce did not err by relying on the Oceana Report to calculate surrogate financial ratios" despite the Oceana Report's failure to "provide disaggregated expenses for raw materials or labor cost"); *see also Certain Fabricated Structural Steel Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5,376 (Dep't of Commerce Jan. 30, 2020) and accompanying IDM at cmt. 2 ("Commerce has previously used financial statements that were not able to break out labor or energy where there were no other useable financial statements on the record.").

CAT asserts that *Weishan Hongda* is distinguishable from this case, contending that, there, "Commerce was able to use its normal methodology to 'calculate appropriate financial ratios,' despite the Oceana Report's failure to 'provide disaggregated expenses for raw materials or labor cost,' . . . because Commerce's manufacturing overhead ratio groups 'materials, labor, and energy costs' in the denominator."  CAT Br. at 29-30 (quoting 917 F.3d at 1368).  CAT contends that "Commerce has not made a similar showing here."  *Id.* at 30.  But Commerce made a similar finding in this case.  Commerce explained that, when it

is unable to segregate expenses in the calculation of the surrogate financial ratios that would otherwise be included in the normal value calculation, its practice is to disregard these expenses in the calculation in order to avoid double-counting costs which have necessarily been captured in the surrogate financial ratios. Appx6916. In this review, however, Commerce explained that it did not disregard energy or labor in the normal value calculation because the two Malaysian financial statements separate overhead expenses such as depreciation from the rest of the costs of manufacture — that is, material, labor, and energy expenses. *Id.* Commerce further explained that it used the lump sum of material, labor, and energy expenses as the denominator in its calculation of the surrogate financial ratios. *Id.* As a result, Commerce found that it did not double-count energy and labor expenses when including them in the normal value calculation. *Id.*; *see also* Appx7921 (in the *Final Results*, rejecting CAT's disaggregation argument after finding that the Malaysian financial statements provided sufficient information to segregate and calculate surrogate ratios for factory overhead costs, SG&A expenses, and profit). Thus, *Weishan* is factually analogous.

Also without merit are CAT's arguments based on speculation. Specifically, CAT contends that Commerce allocated the amount reported in Bravo's basket category line item, "Operating expenses" solely to SG&A, and that, in Century's ratio calculation, Commerce allocated the amount in "Administrative expense" to

SG&A, even though, absent a breakout of transportation expenses, these line items "likely" include such ordinarily excludable expenses.  CAT Br. at 29.  CAT further contends that "Bravo's and Century's *potentially* distorted overhead and SG&A ratios, in turn, *likely* distort the profit calculation."  *Id.* (emphasis added).  These arguments as to what was "likely" included and "potentially" distortive are based on nothing more than speculation — not on record evidence — and, accordingly, should be rejected.  *See, e.g.*, *Weishan Hongda Aquatic Food Co.*, 917 F.3d at 1368 ("Regarding an alleged distorted overhead ratio, the Chinese Respondents fail to explain how the Oceana Report's failure to break out raw materials causes a distortion to the overhead ratio."); *Downhole Pipe & Equipment, L.P.*, 776 F.3d at 1380 (rejecting appellants' argument that "HTS 7304.59.20 *most likely* also lacked entries of drill-pipe green tube" because they "fail to provide any evidence in support of this proposition") (emphasis in the original).

Relying on the tenth and eleventh administrative reviews under this order, CAT asserts that the use of the Century Chemical and Bravo Green financial statements "creates risks" that the financials ratios calculated based on those statements are inaccurate and distorted while the use of the Romcarbon financial statement "eliminates this risk."  CAT Br. at 33 (citing Appx7633-7634).  CAT fails to provide further explanation or record support for its argument.  Thus, CAT's argument is based on nothing more than conjecture and, accordingly,

should be rejected.  *See, e.g.*, *Weishan Hongda Aquatic Food Co.*, 917 F.3d at 1368.  Further, Commerce's findings based on different records in previous administrative reviews are not relevant here.  As Commerce explained when rejecting CAT's argument, "{e}ach administrative review is a separate exercise of Commerce's authority and allows for different conclusions based on different facts on the record."  Appx7921 (citing *Qingdao Sea-Line Trading*, 766 F.3d at 1387).

As an alternative argument, CAT asserts that Commerce should have selected the Russian JSC financial statement as the "second-best option" for determining surrogate financial ratios because its disaggregated expense categories are superior to the insufficiently disaggregated Malaysian financial statements.  CAT Br. at 33-34.  In rejecting the Russian JSC financial statement, Commerce explained that the production experience of JSC — which produces respiratory protection products and activated carbon and implements water treatment projects — is dissimilar to that of the respondents.  Appx7920 (citing Appx1550-1565, Appx3714, Appx3776).  Commerce also found that it is difficult to ascertain what portion of JSC's portfolio relates to the production of activated carbon.  *Id.*  CAT fails to address Commerce's reasoning.

In sum, Commerce's selection of the Malaysian financial statements should be sustained because it explained the deficiencies of the other financial statements on the record and provided a reasonable explanation for its selection when faced

with a choice among flawed financial statements. *See CP Kelco US, Inc. v. United States*, 949 F.3d 1348, 1359 (Fed. Cir. 2020) (in "reinstat{ing} Commerce's decision to use the Thai Ajinomoto financial statements to calculate the surrogate financial ratios{,}" holding that "Commerce sufficiently explained its reason for choosing between two flawed financial statements{ }"); *Qingdao Sea-Line Trading Co.*, 766 F.3d at 1387-88 (upholding Commerce's rejection of importer's preferred financial statement because Commerce's selection was reasonable and supported by substantial evidence); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1322-1323 (Fed. Cir. 2010) (substantially same).

### B.      Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Carbonized Material

To value carbonized material, Commerce selected the Malaysian GTA data for coconut-shell charcoal classified under HTS 4402.90.1000, applicable to the previous period of review, and inflated the value to make it contemporaneous because the Malaysian imports covering the current period of review were only from a broadly-subsidized economy.  Substantial evidence supports Commerce's selection of Malaysian GTA data for coconut-shell charcoal as the best available information on the record to value coal-based carbonized material over CAT's preference for using Turkish import data under HTS 4402.90 ("Wood Charcoal").

38

### 1. The Trial Court Did Not Err In Sustaining Commerce's Determination

In the *Final Results*, Commerce valued carbonized materials using the Malaysian GTA data for coconut-shell charcoal under HTS 4402.90.1000 based on record evidence demonstrating the similarities between the coal-based carbonized material consumed by the respondents and coconut shell-based carbonized material. Appx7925-7926. The trial court held that Commerce provided a reasoned explanation as to why coconut shell charcoal was a more appropriate proxy for the coal-based carbonized material used by respondents than wood charcoal. *Carbon Activated Tianjin Co.*, 650 F. Supp. 3d at 1366 (citing Appx7925-7926). Specifically, the trial court relied on the record evidence demonstrating that: (1) "both coconut shell- and coal-based carbonized material are steam activated{,} whereas wood-based carbonized material is generally chemically activated," impacting "the ultimate physical structure of the carbonized material{;}" and (2) that coconut shell- and coal-based carbonized materials had a different level of filtration than wood-based activated carbon given that coconut shell- and coal-based carbonized materials have a "'substantial' amount of micropore surface area," while wood-based activated carbon has significantly fewer micropores and consists mostly of mesopores and macropores. *Id.*

### 2. CAT Fails To Identify Trial Court Error

Rather than identifying trial court error, CAT's challenges to Commerce's

39

surrogate value selection for carbonized material are based on nothing more than disagreement with the weight the agency assigned to the record evidence. *See* CAT Br. at 34-43.

First, CAT contends that Commerce's selection of Malaysian coconut shell charcoal data to value carbonized material in this review is beset by the same flaws that the trial court identified related to the same surrogate value selection in *Carbon Activated Tianjin Co.*, 586 F. Supp. 3d 1360, related to the twelfth administrative review. CAT Br. at 35, 40-41. In that case, the trial court took issue with Commerce's selection of coconut-shell charcoal to value coal-based carbonized material based on the agency's finding that neither mandatory respondent nor their suppliers purchased carbonized material that was made from wood or nut charcoal because Commerce did not make an analogous finding as to whether the mandatory respondents or their suppliers purchased carbonized material made from coconut shell charcoal. *Carbon Activated Tianjin Co.*, 586 F. Supp. 3d at 1379. Ultimately, on remand, the trial court sustained Commerce's use of import data for coconut-shell charcoal to value carbonized materials. *See Carbon Activated Tianjin Co. v. United States*, 633 F. Supp. 3d 1329, 1334-37 (Ct. Int'l Trade 2023).

Commerce's initial reasoning in the twelfth administrative review for selecting coconut-shell charcoal to value coal-based carbonized material is not

relevant to this case.  Rather, in this case, Commerce provided a reasoned

explanation as to why coconut shell charcoal was a more appropriate surrogate

value for the coal-based carbonized material used by respondents than wood

charcoal.  As the trial court observed, Commerce relied on record evidence

demonstrating that "both coconut shell- and coal-based carbonized material are

steam activated{,} whereas wood-based carbonized material is generally

chemically activated," impacting "the ultimate physical structure of the carbonized

material."  *Carbon Activated*, 650 F. Supp. 3d at 1366 (citing Appx7925).

Commerce also relied on record evidence demonstrating that coconut shell- and

coal-based carbonized materials had a different level of filtration than wood-based

activated carbon.  *Id.* (citing Appx7926).

Second, CAT contends that Commerce's selection of coconut shell charcoal

was unlawful because it was not contemporaneous with the period of review, and

that "the lack of usable contemporaneous data from the principal surrogate country

. . . suggests that this input should be valued using available data from a second

surrogate country."  CAT Br. at 34-35; *see also id.* at 41-43.  Whether surrogate

values are contemporaneous with the period of review is one of the factors that

Commerce considers when selecting the best available information, but it is not a

dispositive factor and, thus, the agency has the discretion to select non-

contemporaneous data.  *See Qingdao Sea-Line Trading Co.*, 766 F.3d at 1386

(sustaining Commerce's decision to find specificity a more important factor than contemporaneity); *QVD Food Co.*, 658 F. 3d at 1326 (sustaining Commerce's surrogate value selection when the agency chose more reliable data over more contemporaneous data).

Commerce properly exercised its discretion to favor specificity over contemporaneity in selecting a surrogate value based on record evidence showing that coconut shell charcoal is the most similar to respondents' coal-based charcoal and, thus, a more specific surrogate value than the broader category of wood charcoal under HTS 4402.90.  Appx7925-7927; *see QVD Food Co.*, 658 F.3d at 1326 ("{W}e agree with the trial court's conclusion that Commerce reasonably reached a different conclusion in different administrative reviews when confronted with an evolving administrative record, after wrestling with competing considerations of contemporaneity on the one hand, and quality and reliability on the other.") (cleaned up).

Third, CAT contends that Commerce's selection of import data for coconut shell charcoal is anomalous because both mandatory respondents reporting using "coal-based" carbonized material.  CAT Br. at 35 (citing Appx7645).  The same argument would disqualify CAT's preference for a surrogate value — wood charcoal under Turkish import data for HTS 4402.90.

42

Fourth, CAT contends that Commerce erroneously valued respondents' coal-based carbonized material using import data for coconut shell charcoal because coal-based carbonized material possesses characteristics that place it "at a midpoint" between coconut shell charcoal and wood-based charcoal related to various characteristics; the products produced from each type of charcoal "differ in uses"; and each type of charcoal has different pore densities. CAT Br. at 35-38. CAT contends that "{a} more appropriate approach would have been to value the goods at the six-digit subheading level, 4402.90, since that subheading encompasses both coconut shell-based and wood-based materials." *Id.* at 38. CAT also contends that "{t}his type of hybrid valuation is compelled by extensive evidence which shows that coal-based activated carbon shares certain characteristics which overlap those of both wood and coconut-shell-based carbonized materials." *Id.* Commerce considered these arguments and rejected them based on record evidence showing the similarities of coal-based carbonized material to coconut shell-based carbonized material. Appx7925-7926. That CAT has devised what it deems to be "{a} more appropriate approach" for surrogate-value selection does not render Commerce's approach unreasonable or unsupported by record evidence. *See Changzhou Trina Solar Energy Co., Ltd. v. United States*, 975 F.3d 1318, 1332-1333 (Fed. Cir. 2020) (observing that, on appeal, appellant "proffers the same rejected evidence . . . and 'invite{s} {us} to

43

reweigh {it},'" and holding that "{w}e decline to do so") (quoting *Downhole Pipe*, 776 F.3d at 1376).

Further, Commerce relied on respondents' own case brief for evidence establishing similarities in the physical structure and function of coconut shell-carbonized materials and coal-based carbonized materials as distinguished from wood-based carbonized materials. Specifically, in their case brief, respondents relied on an "authoritative source" — Canadian filtration equipment company PS Filter — in stating that coconut-based activated carbon is effective for filtration because "up to 90% of the surface area of coconut-based activated carbon consists of micro pores," and "{t}hough less efficient than coconut-based activated carbon, charcoal activated carbon filtration still provides a *substantial micro pore surface area*." Appx7648 (citing Appx4116-4123) (emphasis added). This evidence thus establishes similarities in the physical structure and function of coconut shell-carbonized materials and coal-based carbonized materials as distinguished from wood-based carbonized materials, which "has significantly less micropores and consists mostly of mesopores and macropores" and is "unsuited for the same level of filtration." Appx7926 (citing Appx4074-4082, Appx4116-4123).

Fifth, CAT contends that this Court's nonprecedential decision related to the fourth administrative review, *Jacobi Carbons AB v. United States*, 619 F. Appx. 992 (Fed. Cir. 2015), compels the selection of wood charcoal under HTS 4402.90.

CAT Br. at 39-40.  Even if it were precedential, CAT misreads the import of that case.  Although recognizing that "{w}ood charcoal is also a type of charcoal and can also be used to create the subject merchandise{,}" this Court concluded that "{t}here are no express findings or comparisons between wood charcoal and coconut shell charcoal, and this record does not establish any such conclusions." *Jacobi Carbons AB*, 619 Fed. Appx. at 999; *see also id.* ("the record does not compare coconut shell charcoal and wood charcoal").  That wood charcoal *can* be used to produce subject merchandise does not compel that result here because "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea-Line Trading Co.*, 766 F.3d at 1387.

Sixth, CAT contends that price differences between different types of carbonized materials also favor valuing this input at the six-digit subheading 4402.90 level given that prices for coal-based charcoal overlap prices for wood based charcoal (at the lower end) and coconut shell charcoal (at the higher end). CAT Br. at 38.  Commerce rejected this argument because "record evidence ultimately points to the similarities of coal-based carbonized material to coconut shell-based carbonized material, not wood-based carbonized material."  Appx7925.

Seventh, in support of its argument that wood charcoal under Turkish HTS 4402.90 is the best available information to value carbonized material, CAT points

to the flaws in the contemporaneous Malaysian HTS 4402.90.9000 imports.  CAT

Br. at 41-42.  But Commerce selected Malaysian HTS 4402.90.9000 from the

previous period of review, and Commerce has the discretion to select non-

contemporaneous data if it determines another factor is entitled to more weight.

Appx7927; *see also, e.g.*, *Qingdao Sea-Line Trading Co.*, 766 F.3d at 1386

(sustaining Commerce's decision to find specificity a more important factor than

contemporaneity).  Commerce also relied on its regulatory preference under 19

C.F.R. § 351.408(c)(2) to value all factors of production in a single surrogate

country, resorting to a secondary surrogate country only if data from the primary

surrogate country are unavailable or unreliable.  Appx7927.  On this record,

Commerce had selected Malaysia as the primary surrogate country and found that

the import data from the previous administrative review for coconut shell-based

carbonized material is reliable and is most similar to the coal-based carbonized

material used by the respondents in the production of activated carbon.  *Id.*  As a

result, Commerce found that it had no reason to resort to a secondary surrogate

country to value carbonized material.  *Id.*

Eighth, CAT contends that Malaysian import data for coconut-shell charcoal

is not representative of a broad market average based on import activity, "most of

which did not appear to be sold at commercial levels."  CAT Br. at 42 (citing

Appx7656).  CAT fails to provide any support for this claim or explain why import

activity establishes that the data does not reflect a broad market average. Relying on *Calgon Carbon Corp. v. United States*, No. 14-00326, 2017 WL 384685 (Ct. Int'l Tr. Jan. 27, 2017), CAT contends that, in such cases, Commerce's practice has been to look to data from another identified surrogate country to value the input, and that, on this record, Turkey has the highest import volume of carbonized materials during the period of review. *Id.* (citing Appx7659-7660). *Calgon Carbon* is inapposite because, there, Commerce was employing a "tie-breaking selection methodology based on import volume to select between equally reliable {surrogate value} data sources." 2017 WL 384685, at *2.

Finally, CAT contends that "the {Malaysian} data's accuracy and reliability is suspect{ }" because the average import price for wood-based charcoal is up to five times higher than the prices at which the same material is available domestically. CAT Br. at 42 (citing Appx7657). There are many factors that may impact domestic prices, and CAT fails to provide evidentiary support for the assertion that the Malaysian import data here is an outlier. *See, e.g.*, *Ancientree Cabinet Co.*, 532 F. Supp. 3d at 1254 (explaining that when there is insufficient evidence to determine certain data aberrational or unreliable, Commerce has no basis for rejecting the data).

**C.    Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Coal Tar**

CAT challenges Commerce's selection of the surrogate value for coal tar. CAT Br. at 43-48. These arguments do no more than ask this Court to reweigh the evidence, engage in speculation, or disregard Commerce's practice for determining when surrogate values are aberrational.

**1.    The Trial Court Did Not Err In Sustaining Commerce's Selection Of Malaysian HTS 2706.00 To Value Coal Tar**

In the *Final Results*, Commerce lawfully determined that the Malaysian GTA import data under HTS 2706.00 (Mineral Tars, Including Reconstituted Tars) are the best available information on the record to value coal tar based on publicly available data and the agency's regulatory preference to value all factors of production in a single surrogate country. Appx7913, Appx7915. The trial court found that Commerce supported its selection with substantial evidence, and that CAT and the other mandatory respondent failed to identify record support for their arguments that the Malaysian import data were aberrant. *Carbon Activated Tianjin Co.*, 650 F. Supp. 3d at 1368-69. CAT raises several challenges to the reliability of that data, all of which lack merit.

First, CAT contends that the coal tar average unit value (AUV) from Malaysian HTS 2706.00 was unreliable because it significantly exceeded the AUV of the value-added product, pitch, reported in Malaysian HTS 2708.10. CAT Br. at

43-44.[2] CAT's value-added argument is dependent on the factual premise that "{o}ne would reasonably expect a value-added product like 'pitch' to have an AUV higher than a 'coal tar' product because that product is not subject to further value-added manufacturing operations." *Id.* at 44. As Commerce explained, even if it were true that the AUV of pitch should be higher, which CAT failed to establish, the fact that coal tar pitch has a lower AUV does not necessarily mean that both values are tainted. Appx7913-7914. This is so because there may be factors involved with pricing apart from the cost of manufacturing that impact a product's value and may cause a product that is less "value-added" like coal tar to be more expensive than another product. *Id.* CAT takes issue with Commerce's finding, arguing that "{s}ubstantial evidence supporting this portion of {Commerce's} determination is absent from the record." CAT Br. at 44.

But it was CAT's responsibility — not Commerce's — to build the factual record supporting CAT's value-added argument. *See, e.g.*, *Nan Ya Plastics Corp.*, 810 F.3d at 1338 ("The burden of creating an adequate record lies with interested parties and not with Commerce{.}"); *QVD Food Co.*, 658 F.3d at 1324 (holding that importer "is in an awkward position to argue that Commerce abused its

---

[2] "The average unit value for an input is calculated as the total sum of import values (i.e., the total dollar value of all inputs) divided by the total sum of import quantities." *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1359 (Fed. Cir. 2020).

discretion by not relying on evidence that {the importer} itself failed to introduce into the record").

CAT contends that Commerce unlawfully selected Malaysian HTS 2706.00 import data to value coal tar and Malaysian HTS 2708.10 to value coal tar pitch due to the "{s}tark disparities . . . between the domestic market and Malaysian import prices for both Malaysia and Spain." *See* CAT Br. at 44-46. As Commerce explained, the mandatory respondents' usage of Spanish data to reinforce their allegation of an unusual pricing trend between coal tar and pitch imports into Malaysia suffers from this same deficiency as their value-added argument. Appx7913-7914. Although the mandatory respondents compared the import and export values of HTS 2706.00 in Spain to demonstrate an AUV only one third the size of that in Malaysia, they failed to provide specific evidence to explain why this pattern — of Spanish imports into Malaysia under HTS 2706.00 priced higher than those under HTS 2708.10 — is occurring and thereby renders Malaysian HTS 2706.00 unreliable. *Id.* Thus, CAT again fails to provide specific evidence supporting its claims. *See, e.g.*, *QVD Food Co.*, 658 F.3d at 1324. Likewise, CAT's contention that distortion was "likely" caused by coal tar and pitch being conflated with one another, and consequently entered under incorrect HTS subheadings (CAT Br. at 44) is based on speculation, not evidence.

Further, Commerce explained why it was unable to determine that the AUV for Malaysian HTS 2706.00 was aberrant. To evaluate whether a value is aberrational, Commerce prefers to have historical data on the record. Appx7914. Because Commerce did not have data from the same HTS category for the primary surrogate country over multiple years on the record, the agency was unable to evaluate the aberrancy of the Malaysian data in comparison to historical Malaysian coal tar values. *Id.* Again, "the burden of creating an adequate record lies with {interested parties} and not with Commerce{.}" *QVD Food Co.*, 658 F.3d at 1324.

## 2. Commerce Lawfully Rejected Malaysian Domestic Prices To Value Coal Tar

CAT contends that substantial evidence on the record supports the use of Malaysian domestic prices of coal tar. CAT Br. at 46. CAT relies on the Malaysian domestic price in the Global Coal Tar and Coal Tar Pitch Market Analysis & Forecast 2017-2027, which it contends provides reliable surrogate value data. *Id.* CAT's argument is unsupported by the record.

In the *Final Results*, Commerce rejected CAT's reliance on Malaysian domestic prices because the agency did not have publicly available domestic prices on the record to use as a comparison with import AUVs. Appx7914. Further, Commerce found that it could not rely on the Global Coal Tar and Coal Tar Pitch Market Analysis & Forecast 2017-2027 because that publication did not explain the methodology used to obtain the prices it reports and, as a result, Commerce

51

was unable to confirm their validity. *Id.* Commerce also relied on its preference to select surrogate values that are representative of a broad market average and tax- and duty-exclusive. *Id.* Due to its inability to confirm the validity of the domestic prices, Commerce was unable to determine how representative the prices were of a broad market average or if they are tax- and duty-exclusive. *Id.* (citing Appx4897-5178). Thus, because it was unclear whether the domestic prices for coal tar from this private market report were based on broad market averages or is tax- and duty-exclusive, Commerce could not accept it as a viable alternative to the surrogate value for Malaysian HTS 2706.00. *Id.*

CAT contends that *Hebei Metals Inc. v. United States*, 29 C.I.T. 288, 300 (2005), compels a different result because, in that case, the trial court confirmed the preference for domestic prices as a source of surrogate value data. CAT Br. at 46-47. *Hebei Metals* actually supports the lawfulness of Commerce's reasoning because, in that case, the trial court held that "the conditional preference for domestic data" requires data from a "market economy country from which taxes, duties, and other governmental interference have been excluded{.}" 29 C.I.T. at 300. As discussed above, Commerce was unable to determine whether the domestic prices in the private market report met this requirement. Appx7914.

### 3.    Commerce Lawfully Rejected Russian HTS 2706.00 To Value Coal Tar

Alternatively, CAT contends that Russian HTS 2706.00 constitutes the best information available to value coal tar. CAT Br. at 47-48. Commerce lawfully concluded that CAT's reliance on Russian import data was flawed because that data comes from the same private market report that CAT used to establish Malaysian domestic prices. Appx7914. Because that private market report does not explain how it obtained the reported prices or if those prices are tax- and duty-exclusive, Commerce was unable to confirm how representative the Russian prices are of a broad market average or if they are tax- and duty-exclusive. *Id.* Commerce also relied on its regulatory preference for continuing to select import data from the primary surrogate country. *Id.* Again, in light of Commerce's discretion to prefer publicly-available and tax- and duty-exclusive information and its regulatory preference for selecting data from the primary surrogate country, CAT fails to explain why Commerce's determination was unlawful.

### D.    Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Hydrochloric Acid

Commerce lawfully determined that Malaysian data under HTS 2806.10 (hydrogen chloride (hydrochloric acid)) are the best available information on the record to value respondents' hydrochloric acid (or HCl) input because they are contemporaneous with the period of review, publicly available, product-specific,

53

tax-exclusive, and representative of a broad market average. Appx7932-7933.

Moreover, reliance on the Malaysian data accords with Commerce's regulatory

preference to value all factors of production from a single surrogate country.

Appx7932.

CAT asserts that the Malaysian data is not sufficiently specific to

respondents' HCl inputs because the Malaysian data provides only a single HTS

classification covering both forms of HCl: "(1) anhydrous or liquid form (without

added water); and (2) aqueous solution (with added water)." CAT Br. at 48-50.

CAT contends that respondents' input, in contrast, is HCl in only aqueous form.

*Id.* Commerce found, however, that CAT and the other respondent had failed to

substantiate their assertion that their HCl inputs were, in fact, in an aqueous state.

Appx7933 (citing Appx4048-4051). As Commerce explained, "contrary to the

mandatory respondents' assertion," "the evidence on the record only demonstrates

the purity level of HCl that {CAT} purchased for a portion of the total quantity of

HCl used in production." *Id*. Commerce concluded that this information, standing

alone, did not indicate whether the HCl that the mandatory respondents consumed

during the period of review was in an aqueous state. *Id*. CAT simply ignores the

rationale provided by Commerce.

Further, in the immediately prior review, the trial court came to the same

conclusion related to CAT's showing, holding that the "evidence was insufficient

to clearly define the HCl on the record as aqueous hydrochloric acid or to depart from the Malaysian basket category in favor of the narrower Brazilian { } aqueous HCl data." *Carbon Activated Tianjin Co.*, 586 F. Supp. 3d at 1373-74.  CAT fails to address the trial court's 2022 decision, instead directing the Court to a 2008 Commerce decision.  CAT Br. at 50 (citing *Helical Spring Lock Washers from the People's Republic of China*, 73 Fed. Reg. 4,175 (Dep't of Commerce Jan. 15, 2008), and accompanying IDM at cmt. 4)).  But the 2008 administrative decision does not address the germane issue — CAT's failure to point to record evidence showing that the HCl it consumed during the period of review was in an aqueous state.

CAT also contends that Commerce unlawfully rejected Brazilian 2806.10.20 because it affords product-specific import data to value the specific grade of HC1 used by the respondent — aqueous HCl — and is representative of a broad market average.  CAT Br. at 50-52.  Commerce provided several other reasons for rejecting Brazilian 2806.10.20.  As discussed above, Commerce found that there was no evidence on the record demonstrating that respondents used an aqueous solution of HC1.  Appx7932.  Commerce rejected the evidence provided by CAT — a publication by PubChem, a public chemistry database, as well as a safety datasheet pertaining to HCl produced by Woodman Hill Ltd. — because "{t}he mandatory respondents did not connect this record evidence to support their claim

that Malaysian HTS 2806.10 is not product-specific nor does the record demonstrate a difference in purity levels between the Malaysian and Brazilian import data." Appx7933 (citing Appx1623-1697, Appx1698-1702). Commerce also observed that the Brazilian import data are reported on a free on board (FOB) basis while the Malaysian HTS 2806.10 data on the record was reported on the cost, insurance, and freight (CIF) basis preferred by Commerce. Appx7932. CAT fails to address — let alone rebut — Commerce's rationale.

### E.    Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Steam

Commerce determined that Malaysian data under HTS 2711.11 (liquefied natural gas) was the best available information on the record to value steam because this data was publicly available, and its selection was consistent with the agency's regulatory preference to value, when possible, all of the factors of production from a single surrogate country. Appx7935.

Although recognizing that the record contained import data under both HTS 2711.11 and HTS 2711.21 from the primary surrogate country that are publicly available and tax- and duty-exclusive, Commerce found that the Malaysian import data under HTS 2711.11 was the more appropriate source to value the steam input because the data represent a significantly larger volume of imports (2,876,439,699 kg) from multiple countries (Singapore, Brunei, and Australia), covering nearly the entirety of the period of review. Appx7936-7937 (citing Appx3686-3692,

Appx3930-3981; Appx1804-1811). The import data under HTS 2711.21 represent a smaller volume of imports (872,136.95 kg) from only one country (Brunei) covering only two months of the period of review. *Id.* Because Malaysian HTS 2711.11 represents a broader market average and a larger import volume than Malaysian HTS 2711.21, Commerce determined that Malaysian HTS 2711.11 is the best available information to value steam. Appx7937.

CAT raises several challenges to Commerce's surrogate value selection for steam (*see* CAT Br. at 52-56), all of which fail to address Commerce's rationale let alone why it was unsupported by substantial evidence. First, relying on a dictionary definition of "steam" from its case brief before Commerce, CAT contends that Malaysian HTS 2711.11 is not specific to steam because it is data for liquefied natural gas whereas respondents "reported the use of steam, in a gaseous form defined as 'water in the form of an invisible gas of vapor' to Commerce." CAT Br. at 53 (citing Appx7676 (quoting DICTIONARY.COM ("steam")). However, the dictionary definition of "steam" is an inadequate source for definitively establishing whether the "steam" reported by respondents on this record is more appropriately classified as natural gas in liquid form or in a gaseous state. "Steam" would appear to straddle the line between liquid and gas, depending on its particular state at a given moment. Dictionary.com defines "steam" as "water in the form of an invisible gas or vapor{,}" but also defines the term as

"water changed to this form by boiling{.}"  *See* "Steam," Dictionary.com,

https://www.dictionary.com/browse/steam (last visited March 12, 2024).

Moreover, in sustaining Commerce's surrogate-value section, the trial court

observed that, related to the twelfth administrative review, it "ha{d} previously

rejected the argument that Commerce may not select liquefied natural gas as a

surrogate because it is not 'specific' to steam, noting that 'the energy source input

need not be in the same phase (solid, liquid, gaseous) as the steam the energy

creates." *Carbon Activated Tianjin Co., Ltd.*, 650 F. Supp. 3d at 1372 (quoting

*Carbon Activated*, 586 F. Supp. 3d at 1377).  The trial court further observed that

CAT's "argument is no more developed in this case than it was in {the twelfth

administrative review}, and the court remains unconvinced." *Id.*

Further, respondents may have reported "steam" on the record, but they

failed to place on the record such other information as would have required

Commerce to then value that steam under the HTS subheading for natural gas in its

gaseous state rather than its liquid state.  Appx7935-7936.  As with many of the

other inputs, Commerce was within its discretion to choose from imperfect

datasets.  *See, e.g.*, *Fine Furniture (Shanghai) Ltd. v. United States*, 353 F. Supp.

3d 1323, 1348 (Ct. Int'l Trade 2018) (holding that when "there is nothing on the

record regarding the specific composition {of an input}. . . any claims of greater

specificity of the HTS subheadings that can be applied to them are immaterial");

*Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information.").

Next, relying on *Yantai Oriental Juice Co. v. United States*, 26 C.I.T. 605, 617 (2002), CAT contends that "Commerce nowhere explains how the use of seemingly more expensive imported . . . data is the best available information establishing the actual costs incurred by . . . producers" — specifically, why liquified natural gas is an appropriate substitute over natural gas in the gaseous state. CAT Br. at 53-54. As the trial court explained in distinguishing that case, "{i}n *Yantai Oriental*, "Commerce nowhere explain{ed} how the use of seemingly more expensive imported coal data {was} the best available information," 26 C.I.T. at 617, whereas here, Commerce explained that the domestic natural gas prices identified by Respondents were unreliable and did not represent the best available Information{.}" *Carbon Activated Tianjin Co.*, 650 F. Supp. 3d at 1372 (citing Appx7936). The trial court also observed that, as in the previous administrative review, in this one, "Commerce was unable to establish the underlying methodology Respondents used to derive and collect domestic natural gas prices." *Id.*

CAT also contends that Malaysian HTS 2711.11 import data are unreliable because natural gas domestic prices in Malaysia are significantly lower than the

$US0.53/kg AUV from Malaysian HTS 2711.11 import data for liquified natural gas used as a basis to value respondents' steam. CAT Br. at 54-55. Commerce rejected CAT's reliance on this data because the agency was unable to establish the underlying methodology used by the respondents to derive or collect the domestic prices; the respondents merely placed a table with alternative prices on the record without providing the source of that data, and respondents failed to explain how those prices were determined. Appx7936 (citing Appx5409). In the immediately preceding administrative review, the trial court upheld Commerce's concern with respondents' failure to provide the underlying methodology used to derive the domestic prices. *See Carbon Activated Tianjin Co.*, 586 F. Supp. 3d at 1377 ("The agency also noted that the domestic price data, which Respondents used to argue that the HS 2711.11 data were unreliable, were themselves of undetermined reliability because Respondents had not provided Commerce with the underlying methodology used to derive those prices.").

Further, Commerce found that, while the respondents identified six sources of data for domestic Malaysian natural gas prices, only two of the prices were partially within the period of review. Appx7936 (citing Appx5408-5410). Of these data, one is the price for residential use (0.327 USD/kg) and the other is for commercial use (0.413 USD/kg). *Id.* These data only cover three months of the period of review, and do not represent a broad market average because the data are

price quotes from one company with an unclear geographic scope.  *Id.*  Because of these deficiencies, Commerce found that the domestic Malaysian natural gas data do not represent the best available information and do not demonstrate that the import data under HTS 2711.11 are unreliable.  *Id.*  Unlike the domestic prices relied on by the respondents, the GTA data Commerce used were clearly identified and the method for deriving those prices is available on the GTA website.  *Id.*  Again, CAT fails to explain why Commerce's determination is unreasonable or unsupported by record evidence.

Finally, CAT asserts that Commerce failed to address its argument that "{t}he Malaysian price is corroborated by record evidence of Mexican natural gas prices{,}" which show that "Mexico had the largest natural gas imports of the OP List countries at an AUV of 0.109 USD/kg which is consistent with average Mexican domestic natural gas prices at 0.157 USD/kg."  CAT Br. at 55 (citing Appx7934).  Commerce considered the Mexican natural gas prices, which were included in a table respondents placed on the record.  Appx5904.  Commerce found that "the mandatory respondents merely placed a table with alternative prices on the record without providing the source of that data and they did not establish how those prices were determined."  Appx 7934 (citing Appx5904).  Commerce found that it could not establish what underlying methodology was used by the mandatory respondents to derive or collect the domestic prices set forth

in the table.  *Id.*  Again, unlike the data relied upon by CAT, the GTA data that

Commerce used were clearly identified and the method of deriving those prices

was available on the GTA website.  *Id.*

### F.    Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Ocean Freight

As potential surrogate values for ocean freight, the parties placed on the

record data from Maersk and Descartes.  Appx7929.  Commerce determined that

the data from Maersk represented the best available information to value freight

expenses because that data represented freight tariffs covering the entire 12-month

period of review and various routings.  *Id.*  Unlike the Maersk data, Commerce

found that the Descartes data cover only a part of the period of review for each

route presented.  Appx7930 (citing Appx2096-2097).  Commerce also found that

the Descartes data contain ocean freight charges that are estimates.  *Id.* (citing

Appx2098-2130).  In contrast, Commerce found that the Maersk rates represent

actual tariffs, not mere approximations.  *Id.* (citing Appx3808-3929).  Thus,

Commerce found that the Maersk data are preferable to the Descartes data for use

in valuing the mandatory respondents' ocean freight expenses.

CAT challenges Commerce's findings, but fails to demonstrate that they are

unsupported by substantial evidence.  *See* CAT Br. at 56-59.  First, CAT contends

that the Maersk data is unreliable because they are based on quotes rather than

actual shipments, and the price quotes from Maersk are "generated through online

research by inputting various unknown shipment parameters{,}" and do not represent actual tariffs. CAT Br. at 56-58 (citing Appx7680). But the Maersk data state that "tariff rates have been applied." Appx3808-3929. The trial court found that the inclusion of the language "tariff rates have been applied" was not inconsistent with Commerce's acceptance of the Maersk data as based on actual transactions. *Carbon Activated Tianjin Co.*, 650 F. Supp. 3d at 1373.

Also without merit is CAT's contention that the Maersk data are unreliable because the prices remained static over the period of review. CAT Br. at 58. CAT's argument is based on nothing more than assumptions about the pattern of prices on the record. As the trial court observed, CAT "assumes that ocean freight prices fluctuate frequently throughout the year but fails to support that assertion with evidence." *Carbon Activated Tianjin Co.*, 650 F. Supp. 3d at 1373. Such arguments do nothing to undermine Commerce's determination that the Maersk data are reliable.

Finally, CAT contends that the Descartes data is the best available information on the record because it contains ocean freight charges that represent actual transactions. CAT Br. at 58-59. As discussed above, Commerce disagreed with CAT's assessment, finding that the Descartes data contain ocean freight charges that are estimates and cover only a part of the period of review for each route presented. Appx7930 (citing Appx2098-2130, Appx2096-2097).

\*\*\*

Faced with imperfect alternatives for its surrogate-value selections, Commerce acted within its statutory discretion in selecting among these alternatives and provided a reasoned explanation for its selection. CAT's contentions do not demonstrate that Commerce's determinations are unsupported by substantial evidence. Rather, CAT does no more than impermissibly ask this Court to "reweigh the evidence already considered by Commerce." *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018).

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the judgment of the Court of International Trade.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Deputy Director

OF COUNSEL:

ASHLANDE GELIN
Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance
U.S. Department of Commerce

/s/ Antonia R. Soares
ANTONIA R. SOARES
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington D.C. 20044
Telephone: (202) 305-7405
antonia.soares@usdoj.gov

March 18, 2024

Attorneys for Defendant-Appellee
United States

## <u>CERTIFICATE PURSUANT TO RULE 32(A)(7)(C)</u>

I, Antonia R. Soares, a trial attorney in the Department of Justice, Civil

Division, Commercial Litigation Branch, certify that this brief, which used Times

New Roman font with 14 point type, contains 13,955 (relying upon the Microsoft

Word word count feature of the word processing program used to prepare this

principal brief) and complies with the type-volume limitation contained in Rule

32(a)(7)(B).

 

 

<u>   Antonia R. Soares     </u>
Antonia R. Soares

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that, on this 18th day of March, 2024, a copy of the foregoing BRIEF OF DEFENDANT-APPELLEE UNITED STATES was filed electronically.

__X__ This filing was served electronically to all parties by operation of the Court's electronic filing system.

_____

\_\_\_\_\_ A copy of this filing was served via:

\_\_\_\_\_ hand delivery

\_\_\_\_\_ mail

\_\_\_\_\_ third-party commercial carrier for delivery within 3 days

\_\_\_\_\_ electronic means, with the written consent of the party being served

To the following address:

<u>/s/ Antonia R. Soares</u>
Antonia R. Soares