**2023-2413**

# United States Court of Appeals
# for the Federal Circuit

---

**CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION,**

*Plaintiffs-Appellant,*

**DATONG JUQIANG ACTIVATED CARBON CO., LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD.,**

Plaintiffs

*v.*

**UNITED STATES,  CALGON CARBON CORPORATION, NORIT AMERICAS, INC.,**

Defendants-Appellees.

---

Appeal from the United States Court of International Trade,
Consol. Court No. 22-cv-00017, Chief Judge Mark A. Barnett

---

### REPLY BRIEF OF PLAINTIFFS-APPELLANTS

---

Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave, Ste. 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com

John M. Peterson
  *Counsel of Record*
Patrick B. Klein
NEVILLE PETERSON LLP
55 Broadway, Ste. 2602
New York, NY 11229
(212) 635-2730
jpeterson@npwny.com

*Attorneys for Plaintiffs-Appellants*

April 22, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-2413

**Short Case Caption** Carbon Activated Tianjin Co., Ltd. v. US

**Filing Party/Entity** Carbon Activated Tianjin Co., Ltd and Carbon Activated Corp.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/06/2023

Signature: /s/ John M. Peterson

Name: John M. Peterson

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Carbon Activated Tianjin Co., Ltd and Carbon Activated Corporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS ........................................................... ii

TABLE OF AUTHORITIES ................................................... iii

ARGUMENT ..........................................................................1

I.    The Trade Court Erred in Upholding Commerce's Improperly Calculated Surrogate Financial Ratios.............................................................1

II.   The Trade Court Erred Because Commerce's Decision to Value Carbonized Material for Purposes of the SV Calculation by Using Malaysian Subheading 4402.91.1000, HTS, is Unsupported by Substantial Evidence on the Record and is Not in Accordance with the Law.................13

III.  The Trade Court Erred Because Commerce's Decision to Value Coal Tar for Purposes of the SV Calculation Using Malaysian Data for Malaysian Subheading 2706.00, HTS, or Malaysian Subheading 2708.10, HTS, is Unsupported by Substantial Evidence on the Record and is Not in Accordance with the Law. ...............................................................17

IV.   The Trade Court Erred Because Commerce's Decision to Value Hydrochloric Acid for Purposes of the SV Calculation by Using Malaysian Subheading 2806.10, HTS, Data is Unsupported by Substantial Evidence and is Not in Accordance with the Law. ......................................................19

V.    The Trade Court Erred Because Commerce's Decision to Value Steam for Purposes of the SV Calculation by Using Subheading 2711.11, HTS, Data for Liquefied Natural Gas, is Unsupported by Substantial Evidence and is Not in Accordance with the Law. ................................................................20

VI.   The Trade Court Erred Because Commerce's Decision to Value Ocean Freight on the Basis of Boilerplate Maersk Line Freight Charge Quotes is Unsupported by Substantial Evidence and Not in Accordance with the Law. ..................................................................................................23

CONCLUSION .....................................................................24

ii

# TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 36 C.I.T. 1557 (2012).......12

*Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d 1368 (Ct. Int'l Tr. 2009). ...............................................................................12

*Carbon Activated Tianjin Co. Ltd. v. United States,* 586 F. Supp. 1360 (Ct. Int'l Tr. 2022) ........................................................ passim

*Carbon Activated Tianjin Co. v. United States*, 503 F. Supp. 3d 1278 (Ct. Int'l Tr. 2021) ...............................................................8, 9

*Elkay Mfg. Co. v. United States*, 180 F. Supp. 3d 1245 (Ct. Int'l Tr. 2016). ..........20

*Hebei Metals & Minerals Imp. & Exp. Co.* v. United States, 29 C.I.T. 288 (2005) ............................................................................. 18, 19

*Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159 (Ct. Int'l Tr. 2017).........................................................................12

*Jacobi Carbons AB v. United States*, 365 F. Supp. 1344 (Ct. Int'l Tr. 2019). ..........6

*Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323 (Ct. Int'l Tr. 2019)..........................................................................6

Jacobi Carbons AB v. United States, 619 Fed. Appx. 992 (Fed. Cir. 2015). ..........16

*Seah Steel Vina Corp. v. United States*, 269 F. Supp. 3d 1335 (Ct. Int'l Tr. 2011)..........................................................................16

*SeAH Steel Vina Corp. v. United States*, 950 F.3d 833 (Fed. Cir. 2020) ...............10

*Tudor v. Dept. of the Treasury*, 639 F.3d 1362 (Fed. Cir. 2016). ..........................10

*Weshan Hongda Aquatic Food Co. Inc. v. United States,* 917 F.3d 1353 (Fed. Cir. 2019). ....................................................................11

**Statutes**

19 U.S.C. § 1677b ...........................................................................5

**Other Authorities**

H.R. Rep. No. 100-576 (1988)...........................................................4

*Helical Spring Lock Washers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 4,175 (2008) .......................................................................................19

U.S. Dep't of Commerce, *Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1* (2004), http://enforcement.trade.gov/policy/bull04-1.html ...................... passim

**Regulations**

19 C.F.R. § 351.408 .........................................................................5

Plaintiffs-Appellants, Carbon Activated Tianjin Co. Ltd. and Carbon Acti-vated Corporation (collectively "Carbon Activated"), in accordance with Rules 28(a) and 32(a) of the Federal Rules of Appellate Procedure and the Rules of Prac-tice of the U.S. Court of Appeals for the Federal Circuit, hereby submit their reply brief in this appeal.

Defendants-Appellees assert in their briefing that the Trade Court properly found that all aspects of the final determination by the U.S. Department of Com-merce (the "Department" or "Commerce") in *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Re-view; and Final Determination of No. Shipments; 2019- 2020*, Case No. A-570-904, as published in the Federal Register. *See* 86 Fed. Reg. 73,731 (Dec. 28, 2021) are based on substantial evidence and are otherwise in accordance with law. Plain-tiffs-Appellants submit, as discussed in discussed herein and also in the opening brief, that the Trade Court erred in its findings and that Commerce's decisions were unsupported by substantial evidence.

## **ARGUMENT**

## I.   **The Trade Court Erred in Upholding Commerce's Improperly Calcu-lated Surrogate Financial Ratios.**

As discussed in Plaintiffs-Appellants' opening brief, Commerce's decision to calculate surrogate financial ratios using the data of two Malaysian producers—

Century Chemical Works Sendirian Berhad ("Century") and Bravo Green Sdn. Bhd ("Bravo Green")—was not only unsupported by substantial evidence on the record, but also disregarded Commerce's own policy. Commerce blinded itself to the universe of "significant producers" of comparable merchandise, thereby relieving itself of obligations to consider the data *quality*. As a result, Commerce violated its own policy directives requiring the use of the best available information and the obligation to select financial data which was not sufficiently disaggregated to allow accurate calculation of surrogate financial ratios.

Commerce considers four factors in selecting a primary surrogate country. First, the agency's Office of Policy ("OP") assembles a list of potential surrogate countries at a comparable level of economic development to the non-market economy ("NME") country whose exports are being investigated. Second, Commerce identifies countries from the OP list which are producers of comparable merchandise. Third, Commerce determines which of the identified countries are "significant producers" of comparable merchandise. Fourth, if more than one country satisfies the first three criteria, Commerce selects the country with the best factors data. *See* Import Admin., U.S. Dep't of Commerce, *Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1* (2004), http://enforcement.trade.gov/policy/bull04-1.html ("Policy Bulletin 04.1").

2

In this review, interested parties submitted financial statements from multiple countries for use in Commerce's calculation of surrogate financial ratios for Administrative Review ("AR") 13. Commerce "used the financial statements of two Malaysian producers of identical or comparable merchandise (*i.e.*, Century and Bravo Green)." Appx6915. Although the record included the contemporaneous financial statement of S.C. Romcarbon S.A. ("Romcarbon"), a Romanian producer with data of superior quality, Commerce disregarded this data based on its finding that there was only one surrogate country—*i.e.*, Malaysia—which was a "significant producer of comparable merchandise." Government's ("Govt's") Br. at 19.

While the record shows that numerous surrogate countries were producers of comparable merchandise—*i.e.*, Brazil, Malaysia, Mexico, Romania, Russia and Turkey—Commerce elected to recognize only Malaysia as a significant producer, since it was a "net exporter" of activated carbon. Appx7919-Appx7920. Commerce reasoned that the statute does not define the concept of a surrogate country that is a "significant producer of comparable merchandise," Appx7624-Appx7625, Appx7915, but relied on Policy Bulletin 04.1, *supra*, which explains that "Commerce should define 'significant producer' in relation to world production and trade (subject to availability of data on these characteristics." Appx7918 (emphasis added). Policy Bulletin 04.1 explains further that "the legislative history provides that the term 'significant producer' includes any country that is a 'net exporter' of

3

identical or comparable merchandise." H.R. Rep. No. 100-576 (1988) at 590 (conf. report).

Commerce concluded that it was not required to define "significant producer" in any particular manner because the term "significant producer" is "inherently ambiguous." Appx7918. Instead, Commerce looked only to the "net exporter" factor, treated it as dispositive, and—having concluded that Malaysia was the only "net exporter" of activated carbon during the POR—held that the financial statements from other countries submitted on the record of AR13 could be ignored, thus excusing itself from considering data *quality* in its selection.

The Trade Court's holding upheld Commerce's willful blinding of itself by unreasonably restricting the definition of "significant producer" of comparable merchandise and disregarding the superior quality of financial data in the Romcarbon report. The Trade Court's decision must be overturned.

Policy Bulletin 04.1 prohibits Commerce from applying fixed criteria (*e.g.,* the "net exporter" criterion), and requires that it evaluate the "net exporter" criterion in conjunction with other factors, including the nature of the finished product, the nature of the inputs being valued and the data quality of the surrogate value. Indeed, Policy Bulletin 04.1 stresses that Commerce's paramount concern is "the best available information:"

> Data quality is a critical consideration affecting surrogate country selection. After all, a country that perfectly meets the requirements of

4

> economic comparability and being a significant producer is not of much
> use as a primary surrogate if crucial factor price data from that country
> are inadequate or unavailable.

Policy Bulletin 04-1 (quoting 19 U.S.C. § 1677b(c)(1)(B)

While the governing regulation, 19 C.F.R. § 351.408, does not specify the relative weight to be assigned to each criterion, the Government need not select the surrogate country which is most economically comparable to the NME or the "most significant producer" of comparable merchandise. Instead, it must examine these concepts with the objective of calculating the *most accurate* financial ratios. It follows that a surrogate country having superior quality surrogate value data would not be required to meet the same level of significance of production as a country lacking in such data quality. In this case, Commerce erred in not considering the data *quality* of the Romanian financial statements in making its determination of "significant producer" status. *See* Govt. Br. at 20.

Choosing convenience over quality and accuracy, Commerce sought to shield itself from having to consider the on-record (and superior) financial statements of Romanian producer, Romcarbon, and Russian producer, Joint Stock Company Sorbent ("JSC Sorbent"). Indeed, by narrowing the concept of "significant producer," Commerce could overlook its observation that the two Malaysian producer

financial statements used to derive financial ratios were "not as detailed as Commerce prefers in that none of them have separate line items breaking out the cost of raw material, labor and energy." Appx7921.

Commerce's rigid application of the "net exporter" test is contrary to the agency's own policy and practice, which indicates that:

> [t]he extent to which a country is a significant producer should not be judged against the NME country's production level or comparative production of the five or six countries on the OP's surrogate country list.

Policy Bulletin 04.1. As noted in Appellant's opening brief, at 17-18, this Court has previously rejected a fixation on the "net exporter" criterion in selecting surrogate values. *Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323 (Ct. Int'l Tr. 2019); *Jacobi Carbons AB v. United States*, 365 F. Supp. 1344 (Ct. Int'l Tr. 2019). Here, because the subject merchandise and its inputs are unexceptional, Commerce must apply a sliding scale and an attenuated product requirement when examining potential surrogate countries. The agency did not do this and instead blindly relied on the "net exporter" criterion to determine that "Malaysia is the only significant producer of activated carbon among the OP list countries." Appx7918-Appx7919. This decision is not supported by substantial evidence.

In *Carbon Activated Tianjin Co. Ltd. v. United States,* 586 F. Supp. 1360 (Ct. Int'l Tr. 2022), which involved AR12—*i.e.*, the previous AR of the instant order—

6

this Court rejected Commerce's selection of financial statements of Malaysian producer Bravo Green, noting that the Bravo Green statements, "were not as detailed as Commerce prefers," but did not explain why those statements were superior to those proffered by the respondents. *Carbon Activated Tianjin Co. Ltd. v. United States*, 586 F. Supp. 1360, 1377-78 (Ct. Int'l Tr. 2022)

Commerce's rejection of the Romcarbon and JSC Sorbent financial reports is based on circular reasoning. Commerce states:

> [I]n the Preliminary Results, Commerce analyzed the 2019 Romcarbon statements, but rejected them on the ground that Romcarbon's "production experience" was not as similar to the mandatory respondents' production experience as that of Century Chemical and Bravo Green.

Appx7920. But nowhere does Commerce define "production experience." Indeed, we know Commerce can cite to no authority in support of the notion that, because Romcarbon made products in addition to activated carbon, and therefore is prohibited from being selected as a source of surrogate data for activated carbon.

Instead of selecting "one or more" significant producer countries, Commerce selected only one country "because it was the only net exporter." Govt.'s Br. at 20. As explained above, this is contrary to the policy stated in Policy Bulletin 04.1.

Additionally, Commerce's determination was based on a comparison of production data in Romania and Malaysia; which again, is contrary to the direction of Policy Bulletin 04.1 (providing that the "significant producer" criterion "should not be judged against … the comparative production of the five or six countries on OP's

7

surrogate country list."). Instead of making a country-specific assessment that is "consistent with the characteristics of world production of, and trade in, comparable merchandise," *id.*, Commerce improperly compared one OP country against another to artificially achieve a result that selected Malaysia and eliminated other OP countries, including Romania. This is contrary to prior Commerce practice and wholly unsupported. Appx7622-Appx7623.

In *Carbon Activated Tianjin Co. v. United States*, 503 F. Supp. 3d 1278 (Ct. Int'l Tr. 2021), the Trade Court rejected Commerce's attempt to narrow the field of surrogate countries that are "significant producers" of activated carbon. This Court should similarly reject Commerce's determination here.

Commerce concedes that the two Malaysian financial statements it used to calculate financial ratios are not detailed, and do not break out separately the costs of raw material, labor, and energy. Appx7921. Yet, the agency asserts that the Malaysian statements contain sufficient information to calculate surrogate ratios for factory overhead costs, SG&A expenses, and profit. *Id.* It claims not to value certain factors of product its suspects (but does not know) are included in the aggregated data. While Commerce asserts that it prefers to use financial data from the primary surrogate country "unless those statements are unavailable or unreliable," *id.,* it also acknowledges that in previous reviews of this order, it selected Romanian financial statements over Malaysian financial statements precisely because those Malaysian

financial statements "lack[ed] usable financial data in that none of them have separate line items breaking down the cost of raw materials and energy," *id.,* and when Commerce switched back to Malaysian financial data in the AR12, that decision was disallowed by the Trade Court. *See Carbon Activated Tianjin Co. v. United States*, 503 F. Supp. 3d 1278, 1286 (Ct. Int'l Tr. 2021).

The Malaysian financial reports here do not sufficiently disaggregate data to allow for accurate calculation of financial ratios. Both the Century and Bravo Green financial statements contain a basket category titled "Cost of Sales," which is believed to represent the sum of numerous cost categories, including raw materials, labor, energy, manufacturing overheads, change in finished goods inventory, and traded goods. Without explanation, Commerce allocated the entire "cost of sales" amount to "raw materials." Appellant's Br. at 28. This allocation has direct consequences on the resulting financial ratios.

Under "manufacturing overhead expenses," Commerce allocated only depreciation-related line items. The Malaysian financial statements fail to break out costs of non-depreciation manufacturing overheads (*e.g.,* the costs of consumables, the cost of repairs). Since both companies "costs of sales" likely include a portion of manufacturing overheads, they do not identify an accurate amount of manufacturing overhead expenses. As a result, Commerce's financial ratio calculation is unquestionably distorted.

9

As noted in Appellant's Opening Brief, since the Malaysian firms' financial statements did not accurately account for certain excludable expenses (*e.g.,* transportation), Commerce likely committed errors in calculating SG&A. Commerce claims, without support,  that the Malaysian financials "provide sufficient information to calculate surrogate ratios for factory overhead costs, SGA expenses and profit." Appx7921. The agency is taking a shot in the dark. Romcarbon's financials, on the other hand, contain disaggregated data which would permit a more accurate calculation. Commerce's refusal to consider record-evidence which fairly detracts from its conclusion, renders Commerce's final determination unsupported by substantial evidence. *See e.g., SeAH Steel Vina Corp. v. United States*, 950 F.3d 833 (Fed. Cir. 2020); *see also Tudor v. Dept. of the Treasury*, 639 F.3d 1362, 1366 (Fed. Cir. 2016).

Commerce's final determination is at odds with its own practice of rejecting insufficiently disaggregated financial statements which contain basket category cost items. Indeed, Commerce has previously rejected financial statements which do not contain separate reporting of specific raw materials and energy costs, Appx7628, and noted that financial statements which "do not break out raw material costs" result in a "large gap of unknown costs," Appx7628-Appx7629, and that where financials do not separately break out "factory overhead," it is "impossible to calculate any of the financial ratios." Appx7629.

While Commerce rejected Romcarbon's financial statements without making a determination of data quality, the record evidence shows that Romcarbon's financials are vastly superior in quality to those of the Malaysian producers, providing discrete breakouts for all significant cost categories that are used to calculate the ratios, and identifying cost categories which do not factor in the financial ratios determination. Appx7631. Because of this superior disaggregation, Romcarbon's 2019 financial statement provides accurate, undistorted, and reliable overhead and SG&A ratios.

This Court has in the past approved Commerce's use of superior quality financial statements from a secondary surrogate country over inferior financial statements from a primary surrogate. *See Weshan Hongda Aquatic Food Co. Inc. v. United States,* 917 F.3d 1353, 1366 (Fed. Cir. 2019).

Defendant argues that it made "best guesses" and assumptions about what might be in the aggregated data in the Malaysian financials:

> Further, in the Preliminary Results, Commerce explained that, when it is unable to segregate expenses in the calculation of the surrogate financial ratios that would otherwise be included in the normal value calculation, its practice is to disregard those expenses in the calculation in order to avoid double counting costs which have necessarily been captured in the surrogate financial ratios.

Govt. Br. at 34-35. This explanation does not improve the quality of the data selected, but merely underscores its deficiencies. Using the admittedly inferior Malaysian data when the admittedly superior Romcarbon data is on the record renders

11

Commerce's determination unsupported by substantial evidence. Surrogate value determinations necessarily call upon Commerce to weigh competing available evidence on the record, and Courts have recognized that "a blanket policy of simply refusing to engage in this inquiry does not amount to reasoned decision-making." *See e.g., Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1172 (Ct. Int'l Tr. 2017); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 36 C.I.T. 1557, 1566 (2012); *see also, Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d 1368, 1376 (Ct. Int'l Tr. 2009).

Alternatively, JSC Sorbent's 2019 financial statement offers the second-best option for deriving surrogate financial ratio. This Russian producer's financials were placed on the record, Appx7634-Appx7635, and it sufficiently disaggregates the relative expense categories. Commerce has previously confirmed that JSC is a producer of identical and comparable merchandise, Appx7635; and Russia is an economically compatible OP country and qualifies as a significant producer of comparable merchandise.

The Court should remand this case to the Trade Court with instructions to set aside Commerce's use of the Century Chemical and Bravo Green financial statements, and direct Commerce to use the financials from Romcarbon, or alternatively, JSC Sorbent.

## II.   The Trade Court Erred Because Commerce's Decision to Value Carbonized Material for Purposes of the SV Calculation by Using Malaysian Subheading 4402.91.1000, HTS, is Unsupported by Substantial Evidence on the Record and is Not in Accordance with the Law.

The Trade Court sustained Commerce's decision to value carbonized material based on non-contemporaneous Malaysian import data for subheading 4402.90.10, HTS (coconut charcoal). This decision should be remanded because it is not supported by substantial evidence on the record.

As noted in Appellant's Opening Brief, Malaysian import data for subheading 4402.90.10, HTS, was not available for the AR13 review of the antidumping order against Chinese activated carbon. Commerce instead used the Malaysian subheading 4402.90.10, HTS, data from AR12 and "inflated the value to make it POR-contemporaneous." Appellant's Br. at 35.

Initially, we note that Commerce's selection of Malaysian coconut shell charcoal data for AR12 was recently found by the Trade Court to be unsupported by substantial evidence. *See Carbon Activated Tianjin Co. Ltd. v. United State*s, 586 F. Supp. 1360, 1379 (Ct. Int'l Tr. 2022). Those same flaws apply in this case as well, but the Malaysian data here is further weakened by its lack of contemporaneity.

Commerce's stated practice is to use "prices that are contemporaneous with the review" in selecting surrogate values. *See* Policy Bulletin 04.1. Inflating stale values is a "last resort" to be done only when product specific contemporaneous data to value to the input is completely unavailable from any surrogate country. In this

case, Commerce had superior and contemporaneous data from Turkey—an OP identified surrogate—which could, and should, have been used to value carbonized materials. Moreover, Commerce's surrogate valuation practice to use "prices specific to the input in question," *see* Policy Bulletin 04.1, was not done here. Neither of the mandatory respondents in this review used coconut shell charcoal as a carbonized material. Both, rather, used coal-based charcoal. Appx7645. Record evidence further establishes that coal-based charcoal has critical properties midway between those of wood charcoal (Malaysian subheading 4402.90.90, HTS), and coconut shell charcoal. It would have been far more accurate and appropriate for Commerce to have valued carbonized materials using data at the 6-digit tariff level, subheading 4402.90, HTS, which would have encompassed values for both wood- and coconut-shell-based charcoals.

The Government contends in its brief, Def.'s Br. at 39, that "Commerce valued carbonized materials using the Malaysian GTA data for coconut-shell charcoal under HTS 4402.90.1000 based on record evidence demonstrating the similarities between the coal-based carbonized material consumed by the respondents and coconut shell-based carbonized material." However, as the Trade Court pointed out in *Carbon Activated Tianjin Co. v. United States*, 586 F. Supp. 3d 1360, 1379 (Ct. Int'l Tr. 2022),

While Commerce found it "clear that Carbon Activated's suppliers did not purchase carbonized material that was made from wood or nut charcoal so as to merit the inclusion of HS 4402.90.9000, 'other wood charcoal,' as part of the [surrogate value] valuation," Commerce made no analogous finding as to whether Carbon Activated's suppliers purchased carbonized material made from coconut shell charcoal. I&D Mem. at 43. Thus, the problem Commerce identified with respect to wood-based charcoal also appears to apply to coconut shell charcoal. Absent evidence that Respondents used coconut shell charcoal, Commerce's selection of one subheading (coconut shell charcoal) over another (other wood charcoal) is unsupported by substantial evidence and reasoned explanation.

Commerce repeated its error in this review. The evidence establishes that neither of the mandatory respondents used coconut shell-based charcoal, yet Commerce sought to value carbonized materials solely with reference to coconut shell charcoal trade data. They did use coal-based material, which would have been classified in subheading 4402.90.9000. Yet, Commerce declined to use data from that subheading, or to value this input at the six-digit tariff heading level under subheading 4402.90, HTS, despite substantial evidence on the record showing that the coal-based material the respondents used had properties largely in the mid-range between the properties of wood and coconut shell charcoal. Appx4075. Nor did Commerce explain its reasons for relying solely on the Malaysian subheading 4402.90.10, HTS, data.

As this Court noted in *Carbon Activated Tianjin*, *supra*, "Commerce is within its discretion to choose among imperfect datasets; however, Commerce's decision-making must take into account the facts on the record and reflect a well-reasoned

application of its methodology to the situation." *Id.* at 1379 (citing *Seah Steel Vina Corp. v. United States*, 269 F. Supp. 3d 1335 (Ct. Int'l Tr. 2011)).

It was therefore incorrect for Commerce to value respondents' coal-based carbonized material using solely non-contemporaneous import data for coconut shell material under Malaysian subheading 4402.90.10, HTS. A more appropriate approach would have been to value the goods at the six-digit subheading level—*i.e.*, subheading 4402.90, HTS—since that encompasses both coconut shell-based and wood-based materials. This type of hybrid valuation is compelled by extensive evidence on the record which shows that coal-based activated carbon shares certain characteristics which overlap those of both wood and coconut-shell-based carbonized materials.

As this Court held in *Jacobi Carbons AB v. United States*:

> There are no findings nor have we been presented with record evidence that coconut shell charcoal is a better surrogate for coal-based carbonized material than wood charcoal. Thus for the bulk of the imports at issue, there is no proof that coconut shell charcoal is a better surrogate.

619 Fed. Appx. 992, 999 (Fed. Cir. 2015). The same conclusion applies to AR13. Commerce should have valued this input using an average of data from the six-digit tariff level, subheading 4402.90, HTS. Commerce here defends its decision not to use this approved averaging method by simply noting that each administrative review is a separate exercise of Commerce's authority. Govt. Br. at 40-41. Defendant never explains how the AR13 evidence supports its use of data solely pertaining to

16

coconut-shell-based materials, which neither of the mandatory respondents use, to value this input.

Finally, Commerce ignored flaws in the contemporaneous Malaysian import data for subheading 4402.90, HTS, and eschewed the use of Turkish import data in its stead. While Commerce noted that it was using old Malaysian import data, Policy Directive 04.1 still calls for the use of contemporaneous data. While Commerce asserts that it can use "more reliable" data over more contemporaneous data, Govt.'s's Br. at 41-42, it did not explain what makes the old Malaysian data "more reliable" than the Turkish data on the record. The Court should remand this issue for further explanation.

**III.   The Trade Court Erred Because Commerce's Decision to Value Coal Tar for Purposes of the SV Calculation Using Malaysian Data for Malaysian Subheading 2706.00, HTS, or Malaysian Subheading 2708.10, HTS, is Unsupported by Substantial Evidence on the Record and is Not in Accordance with the Law.**

Commerce valued coal tar as an input using an average of Malaysian import values reported under subheading 2706.00, HTS (tar distilled from coal, from lignite or from peat; other mineral tars), and subheading 2708.10, HTS (pitch). This data was aberrational and unreasonable for Commerce to rely on for several reasons.

First, the average unit value ("AUV") reported in the import statistics was higher than the reported Malaysian domestic price for these products. Second, most of the imports into Malaysia were from Spain—a country with notably unreliable

pricing for these products. Appx7666-Appx7667. Third, the AUVs reported for coal tar and pitch were substantially higher than market prices for pitch, which makes no sense considering that pitch is a "value added" product which sells for more than coal tar. Commerce made no effort to identify any factor which would have made the import AUVs be reported in this manner, instead relying on speculation offered by the domestic petitioners that unspecified factors other than manufacturing costs may impact a product's value.

While Commerce argues that the respondents failed to provide specific evidence of why Spanish prices were unreliable, Def.'s Br. at 50, the mere fact that the import AUVs were aberrational—as shown by a comparison to domestic pricing information on the agency record, Appx7668-Appx7669 —renders the data unreliable.[1] With the record showing Malaysian import AUVs to be as much as 620% higher than domestic prices, Appx7668, it is unlikely that any producer would utilize the imported product in manufacturing. Commerce should have used Malaysian domestic prices to value this factor. In this regard, Commerce made the decision to simply disregard data placed on the record, in the form of a Global Coal Tar and

---

[1] *See Hebei Metals & Minerals Imp. & Exp. Co.* v. United States, 29 C.I.T. 288, 300 (2005) ("[T]he preference for domestic data is most appropriate where the circumstances indicate that a producer in a hypothetical market would be unlikely to use an imported factor in its production process.").

Coal Pitch Market Analysis & Forecast 2017-21, because it claimed not to understand the methodology described therein. But ironically, Commerce has no curiosity into what unknown factors other than manufacturing costs might have caused the Malaysian import AUVs to be aberrationally high.

In *Hebei Metals II*, the court noted that in addition to being Commerce policy, the "conditional preference for domestic data is a logical starting point" for achieving the objective set by Congress for placing a value on NME products. *Hebei Metals & Minerals Imp. & Exp. Co. v. United States*, 29 C.I.T. 288, 300 (2005) Commerce's insistence on valuing coal tar using the admittedly aberrant Malaysian import AUVs renders its determination unsupported by substantial evidence.

**IV.    The Trade Court Erred Because Commerce's Decision to Value Hydrochloric Acid for Purposes of the SV Calculation by Using Malaysian Subheading 2806.10, HTS, Data is Unsupported by Substantial Evidence and is Not in Accordance with the Law.**

Commerce erred by valuing hydrochloric acid ("HCl") using Malaysian import data from subheading 2806.10, HTS—a "basket" provision which includes both aqueous and pure forms of HCl. The record evidence indicates that the mandatory respondents used aqueous HCl, comprised mainly of water. Commerce's selection of a value that is not specific to the input was inconsistent with its prior practice, *Helical Spring Lock Washers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 4,175 (2008), and contrary to the rule that the antidumping statute "prefer[s] data that has greater specificity to

19

the input it is valuing." *Elkay Mfg. Co. v. United States*, 180 F. Supp. 3d 1245, 1253 (Ct. Int'l Tr. 2016). Commerce should instead have used import data from Brazil, the only approved surrogate whose tariff reporting distinguishes "pure" and "aqueous solution" HCl.

Commerce does not deny that the data used was non-specific to the aqueous HCL used by respondents, but in litigation, it contends that the respondents "did not connect this record evidence to support their claim that Malaysian subheading 2806.10, HTS, is not product-specific." Govt. Br. at 55-56. However, the mere fact that the Brazilian import data reported the goods separately establishes that the "basket" Malaysian tariff category was non-specific. Commerce claims that it "rejected" the evidence provided by Carbon Activated to show the material its supplier used, but even assuming the evidence was properly rejected, it was unnecessary to demonstrate that Commerce used non-specific data to value HCl. The use of the non-specific data to value HCl renders Commerce's decision unsupported by substantial evidence.

**V.     The Trade Court Erred Because Commerce's Decision to Value Steam for Purposes of the SV Calculation by Using Subheading 2711.11, HTS, Data for Liquefied Natural Gas, is Unsupported by Substantial Evidence and is Not in Accordance with the Law.**

In another instance of using non-specific data to value an input, Commerce valued steam for surrogate value calculation by using Malaysian subheading 2711.11, HTS, data for liquefied natural gas. Appellants contend that Commerce

20

should have valued steam with reference to the value for natural gas in a gaseous state, as reported in subheading 2711.21, HTS.

Relaying on a dictionary.com definition, the Government argues that "'[s]team' would appear to straddle the line between liquid and gas, depending on its particular state at the moment." Def.'s Br. at 57-58. This argument not only defies common sense and understanding but is also unsupported by Government's own cited definition, which notes that steam is in the form of "invisible gas or vapor," and "water changed to this form by boiling." The Merriam-Webster Dictionary defines "steam" as the "vapor arising from a heated substance" and "the invisible vapor into which water is converted when heated to the boiling point."[2] Merriam-Webster in turn defines "vapor" as "a substance in the gaseous state as distinguished from the liquid or solid state."[3] Steam does not "straddle the line" between liquid and gas—it is gas. Hence, Commerce's use of LNG data to value steam is incorrect. Commerce should have used the Malaysia subheading 2711.21, HTS, data for natural gas in a gaseous state.

---

[2] *See* Merriam-Webster Dictionary, Definition of Steam, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/steam (last accessed April 22, 2024).

[3] *See* Merriam-Webster Dictionary, Definition of Vapor, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/vapor (last accessed April 22, 2024) (emphasis added).

This Court must remand Commerce's determination because the agency had not adequately explained why LNG is an appropriate substitute for natural gas in the gaseous state. *See Yantai Oriental Juice Co. v. United States*, 26 C.I.T. 605, 617 (2002) Similarly, in this case, Commerce failed to explain how the use of LNG explains the cost incurred by Plaintiffs when they did not use a liquid to produce steam, and instead used natural gas in a gaseous state. Commerce's position regarding the larger volume, and broader market average of, the Malaysian subheading 2711, HTS, fails to explain why the LNG data is a better alternative against the gaseous tariff data—which again is the form in which the product was actually consumed in production. The agency has failed to explain its position.

Commerce's determinations are also unsupported by substantial evidence because record evidence of natural gas domestic pricing data in Malaysia contradicts the $US0.53/kg AUV from Malaysian subheading 2711.11, HTS, import data for LNG used as a basis to value respondents' steam. Commerce noted in the Preliminary Results Memo that valuation of steam is directly correlated with 'the cost of natural gas required to generate steam[,]" but it then disregarded this correlation in the Final Results. Appx6923. Here, the record evidence of lower domestic prices for natural gas detracts from the reliability of the data which Commerce used. This aspect of the calculation must also be remanded.

**VI.   The Trade Court Erred Because Commerce's Decision to Value Ocean Freight on the Basis of Boilerplate Maersk Line Freight Charge Quotes is Unsupported by Substantial Evidence and Not in Accordance with the Law.**

Finally, Commerce valued international freight charges using Maersk Line freight quotations which did not represent actual consummated shipping transactions, in the process eschewing Datamyne information placed on the record which showed the freight for actual shipments between China and the United States. The Maersk line data was static over the period of the review, since ocean tariffs are generally "price lists" for all comers against which actual shippers usually negotiate discounts.

The Trade Court erred in upholding Commerce's position that that the Maersk data represented "actual tariffs," Appx37-Appx38, because that data does not equate to actual consummated transactions with actual freight charges. Even in the presence of a filed ocean freight tariff, the tariff itself may provide for downward or upward departures from stated rates, including for volume discounts, and the like. For instance, a shipper entering into a service contract guaranteeing 1,000 containers of business for the year will receive a far more favorable shipping rate than a shipper whose service contract guarantees only 50 containers for the same period. The Maersk quotations included specific disclaimers (*e.g.*, "Please notice! This look up is not covered by a service contract, therefore tariff rates have been applied."). In other words, the tariff quotations are not actual shipping costs.

Most ocean cargo is transported pursuant to service contracts, rather than tariff rates. There is no evidence on the record that the amounts shown in any of the Maersk quotes were ever actually used to ship cargoes. By contrast, the Descartes data shows freight cost data associated with actual cargo movements, not theoretical ones. Again, Commerce failed to "use 'the **best available information'** from a market economy country or countries that are economically comparable to the nonmarket economy country and are 'significant producers of comparable merchandise." *Carbon Activated Tianjin Co. v. United States*, 586 F. Supp. 3d 1360, 1366 (Ct. Int'l Tr. 2022) (emphasis added).

## <u>CONCLUSION</u>

For the reasons given above, Plaintiffs-Appellants respectfully request that this Court vacate the opinion and judgment of the CIT, and remand this matter for proceedings consistent with this Court's opinion.

Respectfully submitted.

/s/ John M. Peterson
John M. Peterson
  *Counsel of Record*
Patrick B. Klein
NEVILLE PETERSON LLP
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Richard F. O'Neill
NEVILLE PETERSON LLP
701 Fifth Ave, Ste. 4200-2159
Seattle, WA 98104
(206) 905-3648
roneill@npwny.com

*Attorneys for Plaintiff-Appellant*

April 22, 2024

## **CERTIFICATE OF COMPLIANCE WITH**
## **TYPE-VOLUME LIMITATIONS**

I hereby certify that the foregoing Reply Brief of Carbon Activated Tianjin Co. Ltd. and Carbon Activated Corporation, complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules. It was prepared using a proportionally-spaced typeface and includes 5,388 words.


   /s/ Patrick B. Klein   
     Patrick B. Klein

April 22, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of April 2024, I electronically filed the foregoing Reply Brief of Carbon Activated Tianjin Co. Ltd. and Carbon Activated Corporation, with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit through the Court's CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system.


       /s/ Patrick B. Klein       
          Patrick B. Klein

April 22, 2024